# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-01335 |
| | ) | |
| v. | ) | |
| | ) | Judge Solomon Oliver, Jr. |
| OBERLIN COLLEGE, | ) | |
| 173 West Lorain St. | ) | |
| Oberlin, OH 44074, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AMENDED COMPLAINT

John Doe[1], by and through his attorneys, Justin Dillon and Christopher C. Muha, files this

amended complaint for breach of contract, gender-based discrimination in violation of 20 U.S.C.

§ 1681 (commonly known as Title IX), and negligence.  In support of this amended complaint,

John Doe states as follows:

### PARTIES

1.      Plaintiff John Doe is, and at all times relevant to this Complaint has been, a

resident of the District of Columbia.  John Doe matriculated as a freshman at Oberlin College

("Oberlin" or the "College") in August 2014.  He was expelled from the College on October 11,

2016.

---

[1] Due to the nature of the allegations in this lawsuit, Mr. Doe is proceeding under the pseudonym "John Doe" and identifies his accuser as "Jane Roe."  He identifies other Oberlin students by their initials.

2.    Defendant Oberlin College is a domestic corporation incorporated by an act of the Ohio Legislature in 1834.  Its principal place of business is in the State of Ohio.  It is located in Oberlin, Ohio, which is located in this District.

**JURISDICTION AND VENUE**

3.    The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because John Doe and Oberlin College are residents of different states.

4.    The Court has supplemental jurisdiction over John Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

5.    Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

**STATEMENT OF FACTS**

6.    On October 11, 2016, John Doe was expelled from Oberlin College based on the decision of a Hearing Panel finding him responsible for committing "Sexual Assault."  The panel concluded that, when John Doe asked Jane Roe to perform oral sex on him late one night, she was too intoxicated to consent, and John Doe should have known that.  Yet Oberlin, like most every school in the country, does not punish all, or even most, drunken sex.  Under Oberlin's Sexual Misconduct Policy (the "Policy"), intoxication negates consent only when it reaches a level of "incapacitation," which the Policy defines as a state "where an individual cannot make an informed and rational decision," is "physically helpless" or lacks "awareness of consequences."  Policy at 20-21.  In the words of Oberlin's Office of Equity, Diversity and

2

Inclusion, which administers the Policy, it connotes an "extreme[]" level of intoxication that makes a person unable "to control their body" or to "understand who they are or what they are doing."[2]

7.      John Doe's panel pointed to just a single piece of evidence to support its conclusion that Jane Roe was incapacitated—not tipsy, not just drunk, but *incapacitated*—when John Doe asked her to perform oral sex on him: Roe's simple statement, "I am not sober," which she made a minute before John Doe's request.  That is all that the panel *could have* pointed to, because by Roe's own admission, it was the *only* outward indicator to John Doe that she was intoxicated at all.

8.      Yet that statement, standing alone, does not mean its speaker is incapacitated.  "I am not sober" could mean that the speaker is merely tipsy, mildly buzzed, moderately intoxicated, or extremely drunk.  It says nothing, in other words, about the speaker's *level* of insobriety.  Even if that statement had occurred in a vacuum, it could not have supported the panel's conclusion that John Doe should have concluded that Jane Roe was incapacitated.

9.      But that statement did not occur in a vacuum.  It occurred after (1) Jane Roe texted with John Doe for over 30 minutes setting up the encounter, asking if she could come to his place, all the while making just a single typo; (2) she walked to his dorm room unaided; and (3) they engaged in 45 minutes of talking, kissing, and vaginal intercourse—during which time, *by Roe's own admission*, there were no external signs of her intoxication.  After all of *that*, the panel concluded that her bare statement, "I am not sober," should have conveyed to John Doe that Jane Roe was so drunk that she didn't know what she was doing and wasn't in control of herself.

---

[2] *See* http://new.oberlin.edu/office/equity-diversity-inclusion/sexual-misconduct/what-is-consent.dot (last visited January 25, 2018) (emphasis added).

10.     On one level—the most important one—that decision is completely shocking. Not only did it violate the Policy's clear definition of "incapacitation," but there was *no* testimony at the hearing that Jane Roe was actually incapacitated in the first place, and Jane Roe gave demonstrably contradictory testimony that dramatically undermined her credibility.

11.     But on another level, that decision unfortunately comes as no surprise at all: Jane Roe was a female student accusing a male student of sexual assault at Oberlin College.  And Oberlin's regime for investigating and adjudicating claims of sexual misconduct is rife with gender bias.  In the words of Meredith Raimondo, one of the Policy's architects and its chief implementer, it was created to be a "survivor-centered process" that she designed and implemented "as a feminist."  Its goal, she has said, is to eliminate "rape culture," an undefined term whose chief characteristic at Oberlin—as evidenced by faculty resource guides, Oberlin's Counseling Center, student opinion leaders, and at least some of its Title IX adjudicators—is an unwavering commitment to treat sexual assault allegations as true, even in the face of serious doubts.  According to Ms. Raimondo, it "discredit[s] ***particularly women's experiences of violence***" to speak of "grey areas" in matters of sexual consent.

12.     An unwavering commitment to treat all sexual assault allegations as true is exactly what Oberlin has implemented: According to its Spring 2016 Campus Climate Report, it had found every single sexual assault respondent who went through its formal resolution process during that academic year responsible on at least one charge.

13.     Jane Roe levied her allegations against John Doe the same semester that report came out.  It was all but inevitable that John Doe would be found responsible.  The fact that the panel could find John Doe responsible only by flouting its clear definition of "incapacitation" and ignoring the obvious problems with Jane Roe's credibility proves that other forces were at

4

work.  John Doe was found responsible, and expelled, because the same gender bias that motivated the drafting of the Policy and its implementation on campus demanded it.

14.     The panel's decision has destroyed John Doe's future and caused him severe emotional distress.  It also violated John Doe's common law and statutory rights.  John Doe comes to this court for redress.

## COLLEGE POLICIES AND PROCEDURES

15.     In the fall of 2014, John Doe matriculated as a freshman at Oberlin College. Upon his enrollment, Doe received a copy of the Policy from the College.  The Policy established Oberlin College's standards for acceptable conduct, and also described the procedures by which the College would investigate and adjudicate alleged violations of its standards.

16.     In consideration for his tuition and attendance at Oberlin College, John Doe received and was given assurances by Oberlin College that it would follow and comply with numerous policies and procedures adopted and put forth by the school, including the Policy.

17.     Under Ohio law, the Policy constitutes a contractual relationship between the College and John Doe.

18.     The College owes its students a duty of care when creating and enforcing standards of conduct.

19.     The Policy prohibits certain conduct by students at Oberlin College, including "Sexual Assault," which it defines as "[h]aving or attempting to have intercourse or sexual contact with another individual without consent."  Policy at 17.  The Policy identifies two forms of Sexual Assault, one of which is "Non-consensual Sexual Intercourse," which it defines as, "Having or attempting to have sexual intercourse with another individual without consent."  *Id.*

5

20.     The Policy makes clear that consent to sexual activity does not exist when one party to the interaction is incapacitated.  The Policy also makes clear, however, that incapacitation is an extreme level of intoxication:

> Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because they lack conscious knowledge of the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction) and/or is physically helpless.  An individual is incapacitated, and therefore unable to give consent, if they are asleep, unconscious, or otherwise unaware that sexual activity is occurring.  The use of alcohol or other drugs does not, in and of itself, negate a person's ability to consent, but a level of intoxication can be reached, short of losing consciousness, in which a person's judgment is so impaired that they become incapacitated and thus are not capable of giving consent. The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impact an individual's:
>
> - decision-making ability;
>
> - awareness of consequences;
>
> - ability to make informed judgments; or
>
> - capacity to appreciate the nature and the quality of the act.

Policy at 20-21.

21.     On its website, Oberlin's Office of Equity, Diversity and Inclusion (the office in charge of administering the Policy and ensuring Oberlin's compliance with Title IX) ("OEDI") explains incapacitation in much plainer language.  In a section titled "Barriers to Consent," it defines "incapacitation" as:

> Lacking the capacity to understand the nature of the sexual interaction – the who, what, when, where, why, or how.  Incapacitation describes a level of intoxication in which a person is *unable to control their body or no longer understands who they are with or what they are doing.*  This includes being asleep, unconscious, *extremely drunk or extremely high.*"[3]

---

[3] *See* http://new.oberlin.edu/office/equity-diversity-inclusion/sexual-misconduct/what-is-consent.dot (last visited January 25, 2018) (emphasis added).

6

22.     The Policy makes clear that, in order to find a student responsible for sexual misconduct based on a partner's inability to consent due to incapacitation, the student, or a sober person in that student's shoes, must have or should have known that his or her partner was incapacitated.  In the words of the Policy, "Evaluating incapacitation also requires an assessment of whether a Responding Party, or a sober, reasonable person in the Responding Party's position, knew or should have known that the Reporting Party was incapacitated."  Policy at 21.

23.     In addition to proscribing certain forms of conduct, the Policy also prescribes the procedures the College must follow when investigating and adjudicating claims of misconduct.

24.     When a report of sexual misconduct is made, it is first handled by the Title IX Team.  "The Title IX Team, led by the Title IX Coordinator, assists in the review, investigation and resolution of reports.  At a minimum, this group includes the Title IX Coordinator, Title IX Deputy Coordinators, and the Director of Safety and Security." *Id.* at 32.  "The Regular members of the Title IX Team receive annual training in strategies to protect parties who experience sexual misconduct or other forms of sex and/or gender related harassment and discrimination and to promote individual and institutional accountability." *Id.*

25.     The Policy does not require that the Title IX Team receive annual training—or any training—in how to conduct impartial fact-finding proceedings.

26.     When a report of sexual misconduct is made, the Title IX Coordinator meets with the Reporting Party to get an overview of the allegations. *Id.* at 34.  The Coordinator is to ensure the immediate safety and wellbeing of the Reporting Party, provide resources to her or him, and "[d]iscuss the Reporting Party's expressed preference for manner of resolution." *Id.*

7

27.     When the Title IX Team determines that a claim must be resolved through formal resolution, "a Hearing Coordinator will be assigned to facilitate the adjudication through a specially trained Hearing Panel." *Id.* at 35.

28.     The Title IX Team then initiates an investigation, which is overseen by the Title IX Coordinator. *Id.* at 35-36.  Investigations "usually" will be completed "within 20 business days." *Id.* at 36.  "In the event that the investigation . . . exceed[s] this time frame," the College promises to "notify all parties of the reason(s) for the delay and the expected adjustment in time frames." *Id.* at 38.  At its conclusion, the investigator prepares a report summarizing the facts he or she has gathered and presents it to the Title IX Coordinator and the Hearing Coordinator. *Id.* at 36.

29.     Upon receipt of the investigative report, the Title IX Coordinator and the Hearing Coordinator determine "whether there is sufficient factual information upon which Hearing Panel could find a violation of" the Policy. *Id.*  If they so conclude, the matter is sent to a Hearing Panel for resolution. *Id.*

30.     Hearing Panels consist of "three trained administrators." *Id.* at 38.  The Panel "will make factual findings, determine whether College policy was violated, and recommend appropriate sanctions and remedies." *Id.* at 43.  The Panel must complete its deliberations "within 2 business days." *Id.* at 45.  If the Panel makes a finding of responsibility, it recommends sanctions to the Hearing Coordinator and Title IX Coordinator, who in turn "impose an appropriate sanction." *Id.*

31.     The Policy states that "[a]ny student who is determined to have committed sexual assault may receive a sanction ranging from suspension to expulsion." *Id.*  The Hearing Panel, however, "may deviate from the range of recommended sanctions." *Id.* at 46.

32.     The Policy promises that "[t]he findings of the Hearing Panel will be documented in writing by the Hearing Panel chair" and that those findings "will detail the findings of fact and the basis/rationale for the decision of the Hearing Panel."  *Id.* at 46.  The outcome of the hearing "will be communicated to the Reporting Party and Responding Party simultaneously and in writing."  *Id.* at 47.

33.     Oberlin "seeks to resolve all reports within 60 business days of the initial report." *Id.* at 38.  In the event that "resolution exceed[s] this time frame," Oberlin promises to notify students "of the reason(s) for the delay and the expected adjustment in time frames."  *Id.*

34.     Appeals may be made only on the basis that (1) the Hearing Panel's decision was the product of procedural error that significantly affected the outcome, (2) there is new exculpatory information that was previously unavailable and could substantially affect the finding, or (3) the sanction imposed was too severe.  *Id.* at 48.

### TITLE IX AT OBERLIN

35.     Since at least the 1990s, Oberlin had what its Vice President and Dean of Students, and former Title IX Coordinator, Meredith Raimondo, characterized as "a very forward-looking policy on sexual offense."[4]   But by late 2012, Ms. Raimondo would later say, it was determined that the policy needed overhaul.  In her words, "that policy had gotten old."[5]  As noted in the College's Spring 2016 Campus Climate Report, "Since 2012, Oberlin has dedicated significant additional resources and planning to address the impact of all forms of sex-based discrimination and harassment."[6]

---

[4] *See* https://oncampus.oberlin.edu/source/articles/2015/03/18/presidents-desk-q-meredith-raimondo-title-ix (March 18, 2015).

[5] *Id.*

[6] *See* Docket No. 10-3 (Spring 2016 Campus Climate Report) at 5.

9

36.    But it wasn't mere age that triggered the policy's updating.  Around October 2012, a female student's very public complaint that Oberlin had traumatized her by the way it handled her sexual misconduct complaint began making the rounds.[7]  Her complaint was not that the respondent in her case had wrongly been found "not responsible"—he in fact accepted responsibility for touching her vagina without her consent and was suspended.  The complaining student, however, insisted this was not adequate punishment and that the length of time the process had taken had harmed her.  *Id.*

37.    Less than a month after this female student's public complaint about Oberlin's sexual misconduct process, Oberlin's president, Marvin Krislov, announced that a task force would be appointed to overhaul its sexual misconduct policy and procedures.  That task force would spend a year and half developing the Sexual Misconduct Policy at issue in this case, as well as the training by which the Oberlin administrators who implement it would be educated. *Id.*

38.    In 2013, while the new Sexual Misconduct Policy was being drafted, one of the members of the task force, Professor Meredith Raimondo, was named Oberlin's Title IX Coordinator, the administrator who "oversees the College's central review, investigation and resolution of reports of sexual harassment, misconduct, stalking and intimate partner violence . . . and coordinates the College's compliance with Title IX."  *See* Policy at 5.  She would remain in that position until July 1, 2016, and since that time has supervised the Interim Title IX Coordinator who replaced her.

---

[7] *See* Adiel Kaplan, "Oberlin 3rd Highest in Reported Sexual Offenses Among Similar Schools," *The Oberlin Review* (Nov. 9, 2012) (*available at* http://oberlinreview.org/3242/news/oberlin-3rd-highest-in-reported-sexual-offenses-among-similar-schools) (last visited January 25, 2018).

39.     In March of 2014, the task force issued a draft of the new Policy and discussed it with the campus community.  Ms. Raimondo made clear, at an open forum that day, that "[o]ne large emphasis of the policy . . . is to ensure that the needs of survivors are met and their psychological and physical safety is guaranteed."[8]  She went on, however, to explain that the new Policy, and its implementation, had a much broader goal as well:

> Professor Raimondo remarked at the Sexual Misconduct Policy Discussion that a broad goal of the revisions is to steer the conversation away from preventative measures that can be taken and instead provide a clear understanding of rape culture, and the actions that can be taken to eradicate this culture.[9]

40.     Neither the draft Policy circulated in March 2014, nor the final version adopted on May 1, 2014, defined "rape culture" or otherwise explained what it meant.  But a wide array of materials—from faculty resource guides, to The Counseling Center, to editorials in *The Oberlin Review*, to tweets from the College's Assistant Dean of Students (an appellate officer in its sexual misconduct adjudications) make clear its primary characteristic: An unwavering belief in the truth of sexual misconduct allegations.

41.     From at least December 22, 2013 through at least March 12, 2015, Oberlin faculty were instructed, via an online resource guide, on how to respond to reports of sexual misconduct that were made to them.

42.     Among other things, that resource guide instructed faculty members to "[b]elieve [a] student" who reports sexual misconduct to them, because "a very small minority of reported sexual assaults prove to be false reports."[10]

---

[8] *See* Ex. 1, "Special Task Force Revises Oberlin's Sexual Offense Policy" (March 1, 2014) at 2. This article was available online at the time that Mr. Doe filed his original complaint but is no longer available online.

[9] *Id.*

[10] *See* http://web.archive.org/web/20131122144749/http://new.oberlin.edu/office/equity-concerns/sexual-offense-resource-guide/prevention-support-education/support-resources-for-

43.     The resource guide cites a single source for that assertion, which placed the rate of false reports *to police and law enforcement* at around 2-8%.[11]  The resource guide fails to explain the myriad things that deter the bringing of false *criminal* reports that would not deter false reports *to campus officials*, including that (1) false crime reports are often themselves crimes, so bringing a false report carries serious consequences; (2) crimes must be proven beyond a reasonable doubt, not just by a preponderance of the evidence, so false criminal reports are less likely to succeed, and therefore be brought; and (3) the rigors of a criminal trial far exceed those of a campus disciplinary adjudication.

44.     The resource guide, however, concerns itself with none of that.  Its instruction is that, because false campus reports allegedly are very rare, students should simply be believed, full stop.

45.     Oberlin's Counseling Center tells faculty and students alike the very same thing, in much simpler and more direct language.  "Sexual assault," its website says, "is any sexual activity experienced by an individual that is ***felt to be*** against her or his will. . . .  If someone ***feels*** assaulted, she or he has been, ***regardless of the 'objective facts' surrounding the incident***."[12]  What *actually happened* isn't important, the Counseling Center proclaims to students and faculty alike; what matters is how an accusing student *feels*.

---

faculty.dot (resource guide as of Dec. 22, 2013, last visited January 25, 2018); http://web.archive.org/web/20150312154233/http://new.oberlin.edu/office/equity-concerns/sexual-offense-resource-guide/prevention-support-education/support-resources-for-faculty.dot (resource guide as of March 12, 2015, last visited January 25, 2018).

[11] *See* http://web.archive.org/web/20131204003812/http://www.ndaa.org/pdf/the_voice_vol_3_no_1_2009.pdf (last visited January 25, 2018).

[12] *Available at* https://www.oberlin.edu/counseling/specific-issues/sexual-assault (last visited January 25, 2018, emphasis added).

46.     That same mentality—that sexual misconduct allegations unfailingly should be treated as true—is evident among the Oberlin student body in the period after adoption of the Policy as well.  In the academic year following the Policy's adoption, the Editorial Board of The Oberlin Review, the College's student newspaper, published two editorials on "rape culture."  Both centered on the widely discussed allegations of "Jackie," published in *Rolling Stone*, detailing a horrendous—and completely false—allegation of sexual assault at the University of Virginia.  The take-home point of both editorials—which were published *after* the falsity of those allegations had come to light—was that it was *right* for *Rolling Stone* to believe and trust "Jackie," despite the falsity of her allegations, because to do otherwise would be to perpetuate "rape culture."  "*Rolling Stone*'s initial statement" retracting the story, which stated that "its 'trust in [Jackie] was misplaced,'" was "symptomatic of [] rape culture" and "invalidated the experiences of survivors far beyond the University of Virginia," the editors wrote.[13]

47.     Four months later, when Columbia University issued a report detailing the journalistic failings of *Rolling Stone* in running the story, the Editorial Board expressed the same opinion.  "[Sabrina] Erdely," the author of the *Rolling Stone* piece, "was right in believing Jackie," they wrote.[14]  "To do otherwise would have been to play into rape culture, which she was trying to challenge with her article."[15]  Erdely "was right not to push Jackie to recount her

---

[13] *See* "Rolling Stone Errors Highlight Poor Journalism, Perpetuate Rape Culture," *The Oberlin Review* (Dec. 12, 2014) (*available at* http://oberlinreview.org/7038/opinions/rolling-stone-errors-highlight-poor-journalism-perpetuate-rape-culture/) (last visited January 25, 2018).

[14] *See* "Columbia's Review of *Rolling Stone* Article Promotes Questioning Survivors Beyond Comfort," *The Oberlin Review* (April 10, 2015) (*available at* http://oberlinreview.org/7922/opinions/columbias-review-of-rolling-stone-article-promotes-questioning-survivors-beyond-comfort/) (last visited January 25, 2018).

[15] *Id.*

story past a point of comfort."[16]  Rather than "doubting the victim," Erdely simply should have

"question[ed] the narrative's suitability for publication."[17]  Sexual assault claimants, in their

view, must never be confronted about the reliability of their stories, because challenging those

stories—even when they're fabulously false—can only serve to perpetuate the "rape culture" that

the 2014 Policy was designed to confront.

      48.     Oberlin's efforts to overhaul its sexual misconduct policy and procedures, by

creating a complainant-centered process designed to combat "rape culture," did not save Oberlin

from public scrutiny of its handling of sexual misconduct claims.  On November 24, 2015—just

three months before the incident at the center of this lawsuit—Oberlin was notified that it was

being investigated by the Education Department's Office for Civil Rights (OCR) to determine

whether it had violated Title IX in a recent sexual assault disciplinary proceeding.[18]  That

investigation, OCR has explained, is not limited to the particular complaint that occasioned it,

but is "a systemic investigation of the College's policies, procedures, and practices with respect

to its sexual harassment and sexual assault complaint process."[19]  Oberlin's status as a target of

investigation was made freely available by OCR and was the focus of local media attention[20] and

---

[16] *Id.*

[17] *Id.*

[18] The letter from OCR notifying Oberlin of the investigation can be found at
https://www.documentcloud.org/documents/3121549-Oberlin-College-15-16-2009.html (last
visited January 25, 2018).

[19] *See* https://www.documentcloud.org/documents/3673160-Oberlin-College-15-16-2216.html
(last visited January 25, 2018) at 1-2.

[20] *See, e.g.*, "Cleveland State, Ohio State and Oberlin College Being Investigated for Possibly
Violating Laws Prohibiting Sexual Discrimination," Cleveland.com (Jan. 11, 2016) (*available at*
http://www.cleveland.com/metro/index.ssf/2016/01/cleveland_state_ohio_state_and_oberlin_coll
ege_being_investigated_for_possible_violations_of_federal_law_prohibiting_sexual_discriminat
ion.html (last visited January 25, 2018).

it brought the College under intense scrutiny by OCR at the very time the College would

investigate Jane Roe's complaint.

49.     That investigation was one of hundreds being conducted by OCR nationwide into

how colleges and universities handle allegations of sexual assault, a wave of investigations that

was accompanied by innumerable reports in the national media that suggested the pervasive

nature of sexual assault committed by male students on college campuses throughout the nation.

And it was no secret that the view of sexual violence OCR was enforcing was a gendered view

that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its

paradigmatic targets.  Its then-head, Catherine Lhamon, made that clear on numerous occasions,

including around the time that Oberlin was investigating and adjudicating the allegations against

Mr. Doe.  As one national media outlet reported in October 2016, in a story on OCR's Title IX

campaign:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C. office during
> an interview with SI.com, she said she couldn't help but to think about the women
> who are suffering every day.[21]

Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be

speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will

raise awareness about sexual assault and highlight men's roles in preventing sexual violence."[22]

And in August 2015 she would tell a different national media publication, "'We don't treat rape

---

[21] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college
campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-
football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).

[22] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California
Universities to Highlight Successes in Addressing Community Responses to Sexual Assault"
(available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rights-
catherine-e-lhamon-visit-two-california-universities-highlight-successes-addressing-community-
responses-sexual-assault, last visited January 25, 2018).

and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual activity experienced specifically by college women.[23]

50.     Ms. Lhamon also left no doubt about the consequences schools faced if they failed adequately to heed OCR's mandates: They would lose all of their federal funding.  "Do not think it's an empty threat," she told a group of university administrators in July 2014.[24] "There is 'a need to push the country forward,'" she said in August 2015, echoing the same sentiment.[25]  "It's nice when you carry the big stick of the federal government," she would say again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[26]

51.     The OCR investigation initiated at Oberlin in November 2015 brought Oberlin under the intense scrutiny of an Education Department that the college knew was primarily concerned with eradicating the perpetration of sexual violence by men against women.  Oberlin

---

[23] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[24] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited January 25, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited January 25, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited January 25, 2018).

[25] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).

[26] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).

knew that failing to appear to OCR during this investigation to be tough on sexual assault alleged by women against men risked substantial negative publicity and a loss of federal funding.

52.    Consistent with that scrutiny and the campus ethos fostered by Ms. Raimondo's 2014 overhaul of the Policy, Oberlin's Spring 2016 Campus Climate Report paints a striking picture of what Title IX enforcement looked like at Oberlin during the 2015-16 academic year. As of the date of its publication (which is not included in the document), Oberlin's Title IX Team had "received and reviewed over 100 reports of potential sex-based discrimination and harassment."[27]

53.    "Most" of those 100 reports involved reporting parties who "request[ed] that the College take no disciplinary action nor inform the responding party about the report."[28]  But of those reports that were investigated, about half were deemed eligible for resolution via Oberlin's formal process, outlined above.

54.    *And in <u>every single case</u> sent through the formal process, the respondent was found responsible on at least one charge:*

> When the threshold was met [for formal resolution], findings of responsibility *on all charges* occurred in <u>70 percent</u> of processes.  <u>In the remaining processes</u>, the responding party was found responsible for *some but not all* of the conduct charges.[29]

**Oberlin, consistent with the "anti-rape culture" ethos instilled by the 2014 Policy, and distilled so purely by the school newspaper's Editorial Board and the school's Counseling Center, literally never told a complaining student, at the end of an adjudication process, "We don't believe you."**  The Oberlin employees who preside over hearings, and who judge

---

[27] *See* Docket No. 10-3 (Spring 2016 Campus Climate Report) at 5.

[28] *Id.* at 6.

[29] *Id.* (emphasis added).

appeals, have quite literally credited, at least partially, the allegations of every single student who came before them in the 2015-16 academic year, as of the date of this report.

55.     Upon information and belief, the vast majority of the Oberlin students who bring sexual misconduct complaints are women, and the vast majority of the Oberlin students accused of sexual misconduct are men.

56.     Ms. Raimondo has made clear that the 2014 Policy overhaul, and its implementation by her in her role as Oberlin's Title IX Coordinator, were motivated by a gendered view of what sexual misconduct is and how it should be addressed.

57.     Ms. Raimondo views sexual misconduct as an offense committed prototypically *by* men *against* women.  In a panel discussion on Title IX held by the American Constitution Society on June 13, 2015, she stated that what Title IX has done is to allow people to "speak about sexual harms done to women" and to "visibilize [sic] gender-based harms and the ways in which that has predominantly affected women."[30]  The first goal of a Title IX hearing at Oberlin, she went on to say, is to provide "a safe supportive space for someone to ask, 'What are the harms you experienced and how can we address them so you can continue your education?'"  As she would state elsewhere, at Oberlin it is a "survivor-centered process" that she came to "as a feminist."

58.     In that same panel discussion, Ms. Raimondo likewise betrayed an understanding that men are the prototypical purveyors of sexual violence.  She argued there that it was wrong to see the emerging nationwide enforcement of Title IX "as anti-men" because Title IX enforcement "opens the possibility of clarifying that most men in college don't assault people," presumably because most men complete college without ending up as a respondent in a Title IX

---

[30] *Available at* https://www.youtube.com/watch?v=EbmfXvd_6gw&t=2679s (last visited January 25, 2018).

proceeding.  Oberlin may be the only place where that fact needs clarification, but whether or not that is the case, Ms. Raimondo's statement betrays an understanding that men are the paradigmatic purveyors of sexual violence.

59.     Ms. Raimondo has also made clear on multiple occasions that Title IX enforcement at Oberlin is motivated by gender bias.  As referenced above, just one month after *The Oberlin Review* doubled down on its insistence that "Jackie" be believed, Ms. Raimondo stated, as to her implementation of the 2014 Policy and its ethos, "I come to this work ***as a feminist*** committed to survivor-centered processes."[31]  And in the panel discussion on June 13, 2015 referred to above, after another speaker talked about the need to devote attention to the standards of conduct that govern the "middle category" of cases – "where we're not talking about predators … or sex with someone who is fundamentally unconscious" – Ms. Raimondo responded that those cases were often called "grey areas," but "I myself am uncomfortable with that [term] ***because I think it's used too often to discredit particularly women's experiences of violence***."  Oberlin's entire Title IX enforcement regime—and in particular, its enforcement of allegations that fall into "grey areas" of consent—are infused with gender bias.

60.     There is concrete evidence that this gendered view of sexual misconduct, where disbelieving sexual assault allegations can only but foster a "rape culture," informed the highest levels of Oberlin's Title IX adjudications in calendar year 2016.

61.     In December of 2016, Ms. Raimondo appointed Associate Dean Adrian Bautista to serve as the Appeals Officer in a sexual assault case involving allegations brought by a female Oberlin student against a male Oberlin student.

---

[31] *See* "The Toughest Issue on (*Any*) Campus" (*available at* https://yalealumnimagazine.com/articles/4137 (July/August, 2015) (last visited January 25, 2018).

62.     **On October 19, fewer than two months before that appointment, Dean Bautista had retweeted the following tweet by a group called "End Rape on Campus": "To survivors everywhere, we believe you."**

63.     Dean Bautista had also participated in an Ohio Alliance to End Sexual Violence ("OAESV") workshop.  OAESV teaches, among other things,

- That an example of "rape culture in our society" is "[c]hoosing not to believe survivors or refusing to take accusations of sexual violence seriously."[32]

- That allegations of campus sexual assault should be met with the "BLAB IT" response model, which teaches campus leaders *like Dean Bautista* to "BREATHE"; "LISTEN"; "AFFIRM"; and "BELIEVE" when a student tells them they have been sexually assaulted.[33]

64.     All of these facts about Dean Bautista were brought to Ms. Raimondo's attention, and to the attention of other Oberlin officials—including Oberlin's General Counsel—as soon as the respondent in that proceeding was informed that Dean Bautista had been designated as his appeals officer.

65.     Nonetheless, Oberlin refused to replace Dean Bautista with another appeals officer.

66.     Dean Bautista affirmed the sanction levied against that respondent in its entirety, rejecting an 18-page appeal in a decision letter that spanned barely a page and a quarter.

67.     In short, in the wake of the drafting and implementation of the 2014 Policy, the entire Oberlin community—from the faculty to whom a report might first be made, to the student body whose concerns motivated the drafting of the 2014 Policy, to the staff members who preside over sexual misconduct adjudications, to the individual largely responsible for drafting

---

[32] *Id.*

[33] *See* http://www.oaesv.org/wp-content/uploads/2016/02/Day-1-Prevention-Workshop-PDF-July-16.pdf.

and implementing that policy—share a common belief: that something called "rape culture" must be eliminated and the primary means of doing so is to adopt an unfailing belief in the truthfulness of sexual misconduct claimants.  And the Policy—inspired by a gendered view of the prototypical parties in such proceedings and a gendered view of how women's claims in "grey area" cases should be weighed—has that as one of its primary goals.

68.     In practice, the hearing system of which Raimondo was an architect and its chief implementer operates with a predetermined and unwavering assumption that female accusers have experienced violence, an assumption that cannot be dislodged regardless of the facts presented.

## THE INCIDENT

69.     Sometime in December 2015, shortly before winter break, Doe and Roe met at a party.  They danced together and later went up to Mr. Doe's room.  They went to sleep, then had consensual, unprotected sex initiated by Ms. Roe the next morning.  Ms. Roe does not dispute that they had consensual unprotected sex that morning.

70.     Ms. Roe and Mr. Doe both agree that they had little interaction, and almost no meaningful interaction, between the time of this encounter and the time of the incident in question.

71.     The incident in question occurred in the early morning hours of February 28, 2016.  Earlier that night Roe had attended a concert, then drank alcohol and smoked marijuana at a few different places as the night went on.  At the last of those places she was described by a friend as "stumbl[ing] a bit" as she walked around the party but "could carry on a conversation" and was "animated."

21

72.     After leaving that party, Ms. Roe went to South Hall, one of Oberlin's on-campus residence halls, to smoke some marijuana.  It is unclear how much time elapsed from the time she stopped drinking at the last party to the time she smoked marijuana, but it is evident that, by 1:02 a.m., she was far from incapacitated.  Between 1:02 a.m. and approximately 1:40 a.m., she had the following extended text message exchange with Mr. Doe:

DOE:   Hey what are you up to tonight?  (1:02 a.m.)

ROE:   Hey i am about to smoke in south  (1:06 a.m.)
        Wanna hang?  (1:06 a.m.)

DOE:   Yea I'll be back Soon (1:11 a.m.)
        Where are you in south?  (1:16 a.m.)

ROE:   2ndfloor  (1:19 a.m.)
        Cool if i come in a bit?  (1:19 a.m.)

DOE:   Yea I'm not in south yet but I'm headed back soon (1:24 a.m.)

ROE:   Okay just let me know  (1:25 a.m.)

DOE:   Yea I'm headed back now I'll be back soon[34]

ROE:   Oh word (1:36 a.m.)

DOE:   Wanna come by in 5?[35]

ROE:   What is your room number?  Yeag[36]

As those texts messages show, Roe was not incapacitated at that time, or at least could not have appeared that way to any reasonable, sober observer.  She engaged in an extended, entirely coherent conversation.  Her responses, on average, were prompter than Doe's, and they contain not a single typo, except for a fat fingers "Yeag" that was meant to be a "Yeah."  It is Roe who

_____

[34] The timestamp for this text message is unavailable.

[35] *Id.*

[36] *Id.*

asked Doe if they can hang out together, and if they can do so in **his** room ("Wanna hang? / Cool if i come in a bit?").

73.     Security card data establishes that Roe arrived at South Hall at 1:37 a.m.  And as the above text messages indicate, she agreed to arrive at Doe's room at approximately 1:45-1:50 a.m.  Roe therefore could not have smoked marijuana for much more than 10 minutes in South Hall before leaving to meet Mr. Doe.

74.     Friends who saw Ms. Roe during this time did not provide any testimony whatsoever suggesting that she would appear incapacitated—not tipsy, not drunk, but *incapacitated*—to a reasonable, sober observer who did not know her well.  Her "speech was not slurred and she seemed steady on her feet," according to one friend.  Another friend believed Roe was high, but only because she was "not animated" like she usually is and appeared "very distant" in comparison to her normal self.  Yet another friend testified that, when Ms. Roe showed her the texts she'd exchanged with John Doe and said she was going to go to his room, the friend asked her, "You good?" and she responded, "Yeah."  No friend testified that Jane Roe had trouble speaking to them or walking to John Doe's room.

75.     Once inside John Doe's room, Roe and Doe briefly engaged in small talk before they began kissing.  They lay on Mr. Doe's bed and kissed for about 10-15 minutes before taking off their clothes.  Mr. Doe put on a condom and the two of them had vaginal sex.

76.     After another 15 minutes, Ms. Roe told Mr. Doe that she was thirsty.  Mr. Doe stopped having sex with Ms. Roe, took off his condom, wrapped himself in a towel, and went into the hallway to get some water.  Ms. Roe drank it when he returned, at which time he gradually resumed having sex with her.

77.     After just a short period of time, Ms. Roe told Mr. Doe that the sex was
uncomfortable because she was "dry down there."  "I'm not sober," Roe told Doe, as a way to
explain to him why she believed she was dry.

78.     Doe did not ignore these statements.  He neither continued having sex with her
nor tried, for even a second, to convince her to continue.  Instead, he asked Jane Roe if she
would perform oral sex on him.  She agreed, and did so until Mr. Doe ejaculated.  Mr. Doe and
Ms. Roe then engaged in friendly small talk as they lay on his bed, after which Ms. Roe got
dressed, collected her things, and left.

### THE INCIDENT IS REPORTED AND INVESTIGATED

79.     On March 9, 2016, Ms. Roe went to Meredith Raimondo and reported Mr. Doe
for sexual assault.  Ms. Raimondo did not inform Mr. Doe of the allegations until a full week
later, via email on March 16, and would tell him only that "the College is investigating a report
that [he] sexually assaulted [Jane Roe] on 2/27/16 while she was incapacitated due to alcohol and
unable to consent to sexual activity."

80.     Two days later on March 18, Ms. Raimondo appointed Joshua D. Nolan to
investigate Ms. Roe's allegations.  Despite the fact that the Policy states that investigations
typically will be completed within 20 days; despite the fact that the Policy states that sexual
misconduct claims will typically be resolved *in their entirety* within 60 days of the date they are
brought; and despite the fact that Ms. Roe's allegations spanned just a single incident that both
parties agree lasted approximately just one hour, it would take Mr. Nolan 120 days *just to issue
his investigative report*.

81.     On May 2, long after the 20-day mark for completion of the investigation had
lapsed and the investigation dragged on, seemingly without explanation, Mr. Doe pleaded with

Ms. Raimondo to hasten the process, because of the significant emotional and physical stress it was causing him.

> I really do feel as though I am at my wits end.  I am continuously more and more surprised by the lack of support from Title XI [sic]. . . .  I have had sleepless nights, eating problems and have been constantly thinking about this for the past months.   This has consumed my life.  My grades have slipped and I am a shell of my former self. . . .  I have lost friends, and I know some of my closest friends will never look at me the same even though I have explained over and over what the situation was . . . .  I cannot get in contact with [Investigator] Josh [Nolan] who has seemingly disappeared.  I have emailed him twice in the past week.  This has been one of the most devastating things to ever happen to me and has cost me dearly and there is no recourse for me.  I write to asking [sic] to get in contact with Josh so we can expedite this process.  Finals is around the corner and I simply cannot go through them with this looming over my head. . . .  Please help me.

82.       Despite the fact that *the entire overhaul* of the Sexual Misconduct Policy Ms. Raimondo had been involved in was occasioned, in 2012, by the pleas of a female complainant who had suffered through too long of an investigation and resolution process, Mr. Doe's pleas to Ms. Raimondo were of no avail.  He sat for finals, as best he could, later that month; and he continued living under that cloud, with his future in the balance, for half of the summer.

83.       Finally, on July 7, Mr. Nolan issued an investigative report summarizing the contents of his investigation.  On that date, more than 100 days after he learned he'd been accused of sexual assault, Mr. Doe finally learned the substance of the allegations against him.

84.       Mr. Nolan interviewed 10 people with knowledge of the events of February 27/28 for his investigation.  He "also interviewed Meredith Raimondo and obtained a summary of her initial meetings with [the] students."

85.       Mr. Nolan's investigation turned up almost no evidence that Ms. Roe was incapacitated when she went to John Doe's room that evening, and quite literally no evidence

suggesting that John Doe, or a reasonable observer in his shoes, could have known she was incapacitated if she were.

### A. Third-Party Testimony about Roe's Level of Intoxication

86.     Mr. Nolan spoke to a number of Jane Roe's friends about her level of intoxication on February 27/28, and specifically about what outward signs, if any, there were to indicate her level of intoxication.  Those friends uniformly testified that they could tell she was intoxicated *because of their friendship with her*, and likewise uniformly testified that outwards signs of intoxication or incapacitation that a stranger would recognize—slurred speech, trouble standing, trouble understanding one's location or situation—were absent.

87.     One friend who saw Ms. Roe after she entered South Hall—just 10-15 minutes before she saw Mr. Doe—testified that Roe "was intoxicated" but that her "speech was not slurred and she seemed steady on her feet."  This friend expressly said that she did ***not*** believe Ms. Roe was "overly intoxicated."

88.     Another friend who saw Ms. Roe inside South Hall just minutes before she went to see Mr. Doe testified similarly.  This friend described Roe as seeming "out of it" because she was "not animated" and was "very distant."  She did not testify that Roe could not control herself, had trouble speaking, or acted incoherently.

89.     A third friend observed Ms. Roe on the couch in the lounge, immediately before she walked to Mr. Doe's room.  That friend sensed Ms. Roe was intoxicated to some degree and asked "are you good?" when Roe told her she was going to go see John Doe.  Roe responded to her, "yes" and then "moseyed" off to John Doe's room.  That friend, in other words, specifically watched Ms. Roe walk to Mr. Doe's room, and specifically testified about her gait—yet did not notice that Ms. Doe had trouble walking, or talking, or understanding the decisions she was

26

making.  The only differences from her normal behavior, this friend observed, is that her movements were "'smaller' and 'slower'" and she was more "stoic, still, and muted" in conversation—comparisons she could make only because of her familiarity with Roe.

**B. Roe's Investigation Testimony**

90.     Roe gave no testimony suggesting she was incapacitated or that John Doe could reasonably have known that she was.  She testified at length about alcohol and marijuana she consumed earlier in the evening, but testified that she left the lounge in South Hall and walked to Mr. Doe's room unaided and without incident.  She did not testify that she stumbled, had trouble walking there, or had trouble finding his room, let alone that John Doe should have suspected she had trouble arriving there.

91.     Roe testified that, when she entered Doe's room, they had an "'awkward'" conversation about a plant she noticed in the corner of his room—precisely the type of awkward conversation two people might have when they'd met for an unexpected sexual encounter.  Ms. Roe never explained what would have prompted this awkward conversation if their meeting had no sexual overtones.

92.     Yet Ms. Roe then testified that, shortly after this conversation ended, Mr. Doe approached her and kissed her and that she was surprised by this kiss.  She says that, in an effort to "slow him down," she said to Mr. Doe, "Hold on, I need to take my shoes off."  But Ms. Roe never claimed that she felt unable to tell Mr. Doe that she simply did not want to kiss him.

93.     Instead, Ms. Roe testified that, after she voluntarily took her shoes off, she sat on Mr. Doe's bed and began to kiss him again.  Ms. Roe never claimed that this kissing was unexpected or unwanted.

94.    Ms. Roe told Mr. Nolan that, as they kissed on his bed, she came to realize that he wanted to have sex with her.

95.    She said that Mr. Doe asked her to perform oral sex on him *and that she responded by asking him if he had a condom*.

96.    She never testified that she was unwilling to have vaginal or oral sex with him at that time.

97.    Instead, Ms. Roe told Mr. Nolan that they both undressed and continued to kiss, and that Mr. Doe then put on the condom she asked him to get and initiated vaginal sex with her.

98.    Ms. Roe testified that the sex was painful.  She told Mr. Nolan that she informed Mr. Doe she "'was not feeling sober'" and was " 'dry down there,'" meaning her vagina.

99.    Ms. Roe told the investigator that, in response to these statements, Mr. Doe removed the condom and immediately continued having sex with her without it.  She never explained why Mr. Doe would remove a lubricated condom and have sex with her with his unlubricated penis when she had just complained about dryness.

100.    Ms. Roe told Mr. Nolan that this unlubricated sex was also painful for her and that Mr. Doe stopped having sex with her when he learned this.  He then, according to her, asked her to give him oral sex again.  Ms. Roe told Mr. Nolan that she replied, "'*Okay*, but I'm not very sober right now.'"

101.    Ms. Roe told Mr. Nolan that during the oral sex, Mr. Doe kept pushing her head down and causing her to gag.  Ms. Roe said that, after Mr. Doe ejaculated, she made up an excuse to leave.  After she left, Ms. Roe went to the room of a friend in South Hall and stayed there for an hour or two.

28

102.     At no point did Ms. Roe testify to the investigator that she exhibited any outward signs of incapacitation, or even intoxication.  She never testified that she slurred her speech, had trouble finding words, had trouble moving, or failed to express her wishes to Mr. Doe.  The only outward evidence relating to her level of intoxication were her statements that she was "not feeling sober" and was "not very sober."  There was no evidence from which a reasonable person would have concluded she was not just tipsy, or not just drunk, but in fact incapacitated— "extremely drunk" in the words of OEDI's website.

103.     The exact opposite was the case: Ms. Roe's own testimony was that she was aware of what was going on and took affirmative steps to "slow things down," to request a condom, and to inform Mr. Doe when the sex was painful, all in real time.

**C. Doe's Investigation Testimony**

104.     When Mr. Doe was interviewed, he testified that he first met Ms. Roe at a party in December 2015, where they danced and eventually went back to his room.  The next morning they had consensual, unprotected sex.  Like Ms. Roe, Mr. Doe said that he and Ms. Roe saw each other only a few times between that time and the time of the incident in question.

105.     Mr. Doe told the investigator that on the morning of February 28, 2016, he texted Ms. Roe a little before 1:00 a.m.  He provided the investigator with a copy of those text messages.  As explained above, they show that, at 1:36 a.m., Mr. Doe told Ms. Roe he was headed back to his room and asked her if she wanted to join him in five minutes.  Mr. Doe testified that Ms. Roe arrived at this room at approximately 1:45 a.m.

106.     Mr. Doe testified that he and Ms. Roe engaged in small talk when she came in.  Like Ms. Roe, he testified that they discussed the plant in the corner of his room.  He specifically

testified that Ms. Roe did not wobble, have trouble standing, or exhibit any other outward signs of intoxication.

107.    Mr. Doe testified that after engaging in small talk, he kissed Ms. Roe, and she returned the kiss.  They lay back on his bed as they continued kissing and removed each other's clothes until they were naked.  Mr. Doe said that he digitally stimulated Ms. Roe as they made out.

108.    As they lay naked next to each other with their genitals touching, Ms. Roe asked Mr. Doe whether he had a condom.  Mr. Doe got up, retrieved a lubricated condom, put it on, and engaged in vaginal intercourse with Ms. Roe.

109.    Mr. Doe then testified to a key interaction Ms. Roe never mentioned.  At some point while they were having sex, Ms. Roe remarked, "My mouth is really dry."  Mr. Doe responded by asking if Ms. Roe wanted a drink of water, and Ms. Roe replied that she did.  Mr. Doe then stopped having sex with her, took off his condom, covered himself with a towel, and went to a water fountain in the hallway to get Ms. Roe a drink.

110.    After Ms. Roe drank the water, Mr. Doe slowly re-initiated the process of having sex with Ms. Roe.  He did so without putting another condom on.  Ms. Roe, who had seen Mr. Doe remove the first condom and who had had unprotected sex with Mr. Doe in December, did not object.

111.    At some point, as they had sex without the benefit of the lubricated condom, Ms. Roe stated that she was dry "down there" because she was intoxicated.  Mr. Doe responded by immediately ceasing their intercourse and lying down next to her on his back.  He then asked Ms. Roe if she would perform oral sex on him, and Ms. Roe agreed.  She knelt over him on his bed and began performing oral sex on him.  Mr. Doe testified that he placed his hands on Ms.

30

Roe's head as she did so but that he never pushed her head down or sensed any resistance whatsoever from Ms. Roe.

112.    Ms. Roe said nothing as she performed oral sex on Mr. Doe.  When Mr. Doe was close to having an orgasm, he said so to Ms. Doe.  She continued performing oral sex and Mr. Doe ejaculated in her mouth.

113.    Ms. Roe then lay down next to Mr. Doe on his bed.  Mr. Doe had his arm around her and they talked for five to ten minutes.  Ms. Roe then stated that she had a lot of work to do the next day and asked if it was okay if she didn't sleep in his room.  Mr. Doe stated it was and Ms. Roe got up to gather her clothes and belongings.  She gathered her things and clothed herself without swaying and without difficulty.  She walked over to Mr. Doe's bed, told him she was glad he texted her, kissed him, and left.

### D. Testimony of Roe's Friend After the Incident

114.    Jane Roe told the investigator that, after leaving Mr. Doe's room, she went to the room of a friend in the same dorm.  **Ms. Roe did not tell that friend that she had been assaulted.**  By her own testimony, she remembered telling that friend only that she was emotional and had had sex with Mr. Doe.

115.    That friend testified that she received a text from Ms. Roe at about 3:00 a.m. and that Ms. Roe came to her room soon afterwards.  The friend confirmed to the investigator that Ms. Roe never told her that Mr. Doe had assaulted her.  She also confirmed that Ms. Doe exhibited no obvious outward signs of incapacitation, but rather seemed "intoxicated" to her, something she based only on her previous experience with Ms. Roe.

116.    **Specifically, this friend testified that Ms. Roe came to her room and expressed regret that she had chosen to hook up with Mr. Doe.  In her words, Ms. Roe told**

31

her, **"I can't believe I was with [Mr. Doe]"** and said she was **"disappointed and upset that she had done something."**  The friend explained to the investigator that she knew Ms. Roe had "hooked up" with Mr. Doe before and that it had been a "non-emotional connection."

117.    As to Ms. Roe's intoxication, this friend explained that, "based on her prior experiences with [Ms. Roe]" she could tell Ms. Roe was intoxicated.  Ms. Roe's speech was not "slurred" but instead was "slower" than it was normally.  After Ms. Roe talked for some time, it additionally became clear to her that Ms. Roe had also smoked marijuana, because her speech patterns resembled patterns she had previously noticed when Ms. Roe had smoked marijuana.  Ms. Roe stayed in the friend's room for an hour or two, then left.

### E. Other Post-Incident Testimony

118.    As the investigative report reveals, Ms. Roe would gradually increase the severity of her allegations as she retold the events of that night over the next several days.  On Monday, February 29, Roe spoke to another friend about her night with Mr. Doe.  She stated that she "had engaged in sexual activity with [Mr. Doe]" and that she "felt" she was "too intoxicated to consent."  This second friend did not testify that Ms. Roe claimed that Mr. Doe used any kind of force or that he pushed her head down as she performed oral sex on him.  She also did not report that Ms. Roe conveyed to her any outward indications that would have indicated her level of intoxication to Mr. Doe.

119.    The investigative report goes on to note that the next day, March 1, Ms. Roe wrote a journal entry purportedly chronicling her encounter with John Doe.  That journal entry is attached to the investigative report.  It largely mirrors the testimony she would eventually give the investigator, with one critical exception.

32

120.     Specifically, according to the journal entry, Ms. Roe told Mr. Doe only <u>once</u>
during their encounter that she was "not sober," and did so before they had vaginal intercourse—
not close in time to when she performed oral sex on him.  Later, to the investigator, she would
claim she said this to Mr. Doe a second time—just before performing oral sex on him.

121.     On March 3, two days after writing that journal entry, Ms. Roe told another friend
that Mr. Doe had "sexually assaulted" her, apparently the first time she used that phrase to
describe what had supposedly occurred that night.  On March 4, she explained to this third friend
what she meant by it, saying that Mr. Doe had "forced oral sex on her."  This friend could not
recall whether Ms. Roe had also told her that they had had vaginal intercourse that night.
Critically, this friend did not report that Ms. Roe described any outward manifestations of her
alleged incapacitation that night.

**THE HEARING**

122.     On October 5, 2016—almost seven months after Ms. Roe's charges against Mr.
Doe were brought—Oberlin convened a hearing to weigh those charges.

123.     A few days prior to then, Mr. Doe asked the Title IX Team that they designate
someone to serve as his advisor at the hearing, an offer the Title IX Team had previously made
to him.

124.     In response to his request, the Title IX Team appointed Assistant Dean Adrian
Bautista to serve as his advisor.  As recounted above, it was Dean Bautista who would retweet,
just two weeks later, "To survivors everywhere, we believe you."

**A. Ms. Roe's Testimony**

125.     Ms. Roe was the first to testify at the hearing.  She did not testify that she slurred
her speech, had trouble speaking coherently, or stumbled around in Mr. Doe's room.  She did not

testify that she had difficulty removing her clothes or his.  And she did not testify that she was
unable to decline Mr. Doe's request for oral sex because of her level of intoxication.

126.    In fact, on that point, Ms. Roe changed her testimony dramatically.  When
directly asked whether Mr. Doe *requested* she perform oral sex on him before she did so, Ms.
Roe testified unequivocally, "No."  Her story, at the hearing, was that Mr. Doe simply grabbed
her neck and forced her mouth onto his penis after he stopped having vaginal intercourse with
her.  That testimony *directly contradicted* the story she told Mr. Nolan during the investigation
("She stated that he stopped having sex with her and asked her to 'go down on him again.'  She
remembers telling [Doe], "Okay, but I'm not very sober right now.'") and *directly contradicted*
what she wrote in her journal on March 1 ("Then asked me to go down on him[.]").

127.    Ms. Roe went on to testify that she physically resisted Mr. Doe's efforts to force
her to perform oral sex.  She testified that she had "a very strong memory of [her] neck
straining" against his pushes "until he ejaculated in [her] mouth."

128.    As explained above, Ms. Roe testified during the investigation that she told Mr.
Doe on two occasions that she was not sober, once as they had sex and again in response to his
request that she perform oral sex on him.  But because Ms. Roe changed her testimony at the
hearing to claim Mr. Doe had forced the oral sex upon her, there was no place in her story for
this second alleged disclosure of her insobriety.  She therefore testified at the hearing to only one
instance in which she told Mr. Doe she was not sober.

129.    After answering some questions about the amount of alcohol and marijuana she
consumed that night, Ms. Roe was expressly asked, "[C]ould you tell us how [Mr. Doe] would
have known that you were intoxicated?"  She responded by pointing to just one thing: "Um, I

made the statement, 'I am not sober right now.'  When I was in his room.  And I said, 'I don't feel very sober right now.'  And that was when I was laying on my back."

130.    Ms. Roe pointed to no other outward indicators of her intoxication.  She did not claim that her speech was slurred or delayed, that she had trouble speaking coherently, or that she had trouble with physical movement.

131.    Ms. Roe was never pressed by the panel on why she was now reversing her claim to have told Mr. Doe twice, not once, that she was not sober.

132.    Later in her questioning, Ms. Roe was asked again "what others recognize in you when you're intoxicated."  She responded by identifying just two things: a tendency "to speak, um, in less frequent intervals" and to "mov[e] slower."

133.    She was not asked, and did not explain, how she looks when she is not merely intoxicated but incapacitated.  More importantly, she did not claim that she spoke or moved more slowly in Mr. Doe's room that night.  Nor did she explain how Mr. Doe, given his limited prior interaction with Ms. Roe, could have known she was speaking or moving more slowly than is normal for her even if she had been.

134.    Ms. Roe was asked at the hearing to "speak a little more about why [she] asked [Mr. Doe] for the condom" before they had vaginal intercourse.  She did not respond that she was too intoxicated to have had a cogent reason, that she couldn't remember the reason because she was intoxicated, or that it was some kind of diversionary tactic.  She testified that, if they were going to have sex, she wanted it to be protected sex: "We, were no longer clothed and I felt that if anything was going to continue happening, I wanted a condom.  Yeah."

135.    Ms. Roe, by her own testimony, understood what was happening in real time, had desires about how she wanted those events to continue, and effectively communicated those

desires to Mr. Doe.  And by her own admission, Mr. Doe immediately complied with her request, even though they'd previously had unprotected sex.

136.    At the end of her questioning by the panelists, Mr. Doe directly asked Ms. Roe whether he "ask[ed her] to perform oral sex" before she did so.  Ms. Roe responded unequivocally, "No."

### B. Ms. Roe's Witnesses

137.    Three witnesses testified on behalf of Ms. Roe at the hearing.  None gave any evidence that Ms. Roe exhibited outward signs of incapacitation before she went to Mr. Doe's room.

138.    The first friend of hers to testify was the friend whose room Roe went to after the encounter with Mr. Doe, around 3:00 a.m.  That friend gave no testimony about any obvious outward signs of intoxication exhibited by Roe.  She testified that Roe came into her room and the two of them talked about the evening.  At some point during their talk Roe began to cry.  She "wasn't necessarily making coherent sentences" as she cried.  Eventually she collected herself, stopped crying, and then, according to her friend, "said that she couldn't talk about it right now" but "would check in with me the next day."  Roe, according to her friend, then got up, collected her things, and left.  Her friend did not testify that Roe had any difficulty doing so.

139.    In response to a direct question about "what it look[s] like to someone on the outside" when Ms. Roe is intoxicated, that friend responded that she knew from her own past experience with Ms. Roe that she is "boisterous" when drunk but "very calm, placid, usually a little lethargic" when high.  She further noted that as they talked, Ms. Roe was "not making sense with the sentences she was saying," which is equally explained by Roe's emotional state and her crying as by any level of intoxication.

36

140.     That friend was further asked what she meant when she told the investigators that Ms. Roe was "upset that she had done something" on the night in question.  The friend replied that Ms. Roe had a crush on a different man (besides Mr. Doe) who "had expressed interest in her."

141.     The second friend of Roe's to testify was the friend with whom she'd sat on the lounge couch in South Hall, just before she went to see Mr. Doe.  That friend testified that Ms. Roe showed her the texts with Mr. Doe and said, "I think I'm going to go hang out with [Mr. Doe]."  She testified that Ms. Roe was "out of it" but that she knew this only because she was "very familiar with [Ms. Roe's] states."  She clarified, however, that Ms. Roe "was pretty affected um *but not so much that like she couldn't, like, at least at that point, that she like couldn't be speaking with me."*  The whole situation, the friend said, "seemed pretty normal" to her and not like "a potentially bad situation."  When she asked Ms. Roe, "Are you good?" Ms. Roe responded, "Yeah," and that friend didn't protest or feel the need to intervene when Ms. Roe got up to go to Mr. Doe's room.  As explained above, this friend testified during the investigation that she specifically observed Ms. Roe's gait as she walked to Mr. Doe's room and did not testify that Roe walked with any difficulty whatsoever.

142.     This second friend was then directly asked at the hearing how it looks "to others who [don't] necessarily know" Ms. Roe when she's "cross-faded" (i.e., both drunk and high at the same time).  The friend responded, "not necessarily expressive in her face," "moving very slowly" and "processing slowly."  She candidly admitted, "I guess it's harder for me to say because I do like know her really well.  Like, I mean, it's like harder for me to say like how it would look for somebody who doesn't know her."

143.    This second friend was then asked what she meant when she asked Ms. Roe that night if she was "good."  She responded that, since they had been drinking, and since Ms. Roe had also gotten high, she was "just making sure that it was (a) something she wanted to do, like go see a boy in his room late at night, um and (b) like, trying to ask if like she was like feeling, um, like in herself enough to make that decision."  This friend, therefore, understood that Ms. Roe was going to see Mr. Doe for a romantic encounter, yet did not object when Ms. Roe responded that she was fit to do so and left to go to his room.

144.    Ms. Roe's third witness was a friend who was present with her at the Conservatory house where she'd been drinking earlier that evening.  He testified to how much Ms. Roe drank there.  He did not give any testimony about whether she exhibited any outwards signs of intoxication or incapacitation.

**C. Mr. Doe's Testimony**

145.    Mr. Doe testified next.  His testimony was consistent with the testimony he gave during the investigation.  He stated unequivocally that Ms. Roe exhibited no signs of incapacitation, or even intoxication, during their encounter.  He noted that there were no typos, or even grammatical errors, in the text messages she sent him as they arranged the visit.  She made her way to his room unassisted.  She was neither slurring her speech, speaking incoherently, stumbling, or otherwise physically impaired.  Their conversation, he testified, consisted only in "small talk" and was very basic, and Ms. Roe had no trouble whatsoever carrying on that conversation. **His testimony on all of those points went unrebutted.**

146.    As to the events that took place, Mr. Roe testified, as he had during the investigation, that after he and Ms. Roe engaged in small talk, they made out, undressed, and had protected sex.  When Ms. Roe indicated she was thirsty Mr. Roe got up, removed his condom,

wrapped himself in a towel, and got her a drink of water from the fountain in the hallway.  When he returned they had unprotected sex until Ms. Roe expressed discomfort, noting that she was not sober and was dry down there.  Mr. Doe then asked Ms. Roe to perform oral sex on him, and Ms. Roe agreed.  He unequivocally denied that he applied any pressure to Ms. Roe's head as she did so.

147.    Mr. Doe was expressly asked whether he thought Ms. Roe was able to consent after she told him she was not sober.  Mr. Doe explained that when Ms. Roe said she was not sober and was "dry down there," she was saying that the reason she was dry was because she was not sober.  He explained that it was a Saturday night and he presumed she had had a few drinks.  He took her to be explaining to him why the unprotected sex was uncomfortable for her.

148.    Mr. Doe was also asked how many times Ms. Roe said she was not sober that night, and Mr. Doe replied she had said it just once, consistent with his investigation testimony and the story Ms. Roe told in her March 1st journal entry.

**D. Mr. Nolan's Testimony**

149.    When Mr. Doe finished testifying, the panelists asked the investigator, Josh Nolan, whether he heard any testimony that contradicted what he had been told in the investigation.  **The investigator responded that he heard just one contradiction: Ms. Roe's testimony that Mr. Doe had not asked her to perform oral sex on him.**  Mr. Nolan explained that during the investigation, Ms. Roe testified that Mr. Doe had in fact asked this of her.

**E. Final Remarks by Ms. Roe**

150.    After Mr. Nolan finished testifying, Ms. Roe asked for an opportunity to address the panel again.  She testified that she remembered telling Mr. Nolan only "I think so" when asked whether Mr. Doe "asked for consent for oral sex" but that, after she "thought about it

today for a really long time, I don't have any memory of that."  She testified, in other words, that the investigative report misrepresented her testimony on this critical fact.  Ms. Roe did not address her March 1st journal entry, in which she unequivocally stated that Mr. Doe asked her to perform oral sex on him.

151.    The hearing, therefore, produced no evidence whatsoever that Ms. Roe exhibited outward signs of incapacitation, and only scant evidence she exhibited outward signs of *any* level of intoxication.  Ms. Roe and Mr. Doe both testified that Roe said she was not sober, which could mean anything from "she had a single drink" to "she was unable to stand."  Ms. Roe testified she was speaking in longer-than-normal intervals and moving more slowly than she normally does but gave no reasons why someone who didn't know her could have discerned that. The friend who sat with Roe in the lounge immediately before she saw Mr. Doe testified that, because she was "very familiar with [Ms. Roe's] states" she could tell Ms. Roe was intoxicated, "but not so much that she couldn't" carry on a conversation or decide whether to go to Mr. Doe's room so late at night.  And the friend whose room Roe went to afterwards testified that after the encounter Ms. Roe spoke incoherently while crying and had trouble putting some sentences together, but was not slurring her words and ended their conversation with a completely coherent exchange.

152.    Dean Bautista, Mr. Doe's advisor, left the hearing early.

### THE DECISION

153.    On October 11, 2016, Oberlin issued a decision letter notifying the parties of the outcome of the hearing.  It found Mr. Doe responsible for sexual misconduct because "the preponderance of the evidence established that effective consent was not maintained for the entire sexual encounter that occurred on February 28, 2016."

154.    As that language suggests, the panel did not conclude that consent was absent for the entire encounter.

155.    Rather, the panel found there was not "effective consent" for the oral sex Ms. Roe performed on Mr. Doe.

156.    It concluded that, after Ms. Roe told Mr. Doe she was "not sober," he should have known she was incapacitated—not merely intoxicated, not just drunk, but *incapacitated*.

157.    From that moment on, "the Reporting Party was incapacitated and not capable of giving effective consent when asked to perform oral sex."

158.    Based on that statement, and "the corroborating statements of" her friends about her intoxicated state, Ms. Roe "was incapacitated and not capable of giving consent when asked to perform oral sex."

159.    In reaching that conclusion, the hearing panel necessarily concluded that, prior to her declaration that she was not sober, Ms. Roe did not exhibit any outward behaviors that would have indicated to a reasonable person that she was incapacitated.  If she had, the hearing panel would had to have concluded that the entire encounter, and not just the oral sex at its very end, was nonconsensual.  At most, the panel could have concluded only that Ms. Roe's behavior showed her to be intoxicated but not incapacitated.

160.    The panel never explained, however, how a statement by Ms. Roe that she was "not sober" should have led Mr. Doe, or a reasonable person in his shoes, to conclude anything about her level of insobriety.  The statement "I am not sober" is equally true whether a person has had one drink or ten drinks.  It just as accurately describes a person who is merely buzzed as it does a person who cannot stand under their own power.  Even if Ms. Roe had exhibited outwards signs indicating she was drunk—and by her own testimony she did not—her statement,

41

"I am not sober" would only have confirmed what those outward signs indicated: that she was drunk.  Verbal confirmation of those outward signs would have done nothing more than that—confirm them.

161.    Yet, in concluding that effective consent was absent for only part of the encounter, the panel necessarily concluded that whatever outwards signs of intoxication Ms. Roe exhibited to that point should not have led Mr. Doe, or a reasonable observer in his shoes, to conclude Ms. Roe was incapacitated.

162.    The panel, in any event, did not identify what testimony in the "corroborating statements of witnesses about the intoxicated state of the Reporting Party" should have led John Doe, or a reasonable person in his shoes, to conclude Jane Roe was not just intoxicated, not just drunk, but *incapacitated*.  As explained above, those statements, in both the investigation and at the hearing, provide almost no evidence by which an outside observer who did not know Ms. Roe could have concluded she was intoxicated at all, let alone *incapacitated*.  Those statements, at most, provide evidence that Ms. Roe may have in fact been intoxicated; they contain no evidence showing, or even suggesting, how an outside observer who was not a close friend of hers could have known that.

163.    Because Mr. Doe should have known, in the middle of this sexual encounter, that "I'm not sober" meant Ms. Roe was not buzzed, not drunk, but incapacitated, Oberlin imposed the most severe sanction possible upon Mr. Doe and expelled him.

## THE APPEAL

164.    Mr. Doe appealed the hearing board's decision on October 24.  He challenged the hearing panel's finding on three grounds: that new information not available at the time of the

hearing affected the finding; that procedural and substantive errors did so as well; and that the

sanction was disproportionate to the wrongful conduct he was found to have engaged in.

165.    As to the first of these grounds, Mr. Doe presented two exhibits from J.B., *Ms.
Roe's "best friend" until the hearing in question and a mere acquaintance of Mr. Doe*.  Ms. Roe

spoke with J.B. about the events of February 28 two days after those events occurred, and asked

J.B. to accompany her to her interview with Mr. Nolan as her designated support person.  J.B.

did so, and grew alarmed when Ms. Roe's testimony to Mr. Nolan about the events in question

differed in dramatic respects from what she had told him just two days after those events.  He

didn't say anything during that interview, however, because he felt awkward saying so in Ms.

Roe's presence, and Mr. Nolan had already told him he would call him back at some point to

interview him alone.  Mr. Nolan never did.

166.    On October 11, as soon as J.B. heard that Mr. Doe had been found responsible

and had been expelled, he wrote an email to Ms. Raimondo.  That email explained how "[Ms.

Roe]'s story changed between her conversation with myself two days following the event and

her official statement to [Mr. Nolan]."  Specifically:

- J.B. explained that Roe originally told J.B. simply that the sex had hurt, but told Mr.
  Nolan she affirmatively said "no" to Mr. Doe.

- J.B. explained that Roe originally told him Mr. Doe "merely placed his hand on the back
  of her head," but told Mr. Nolan she "had her head forced down" by Doe.

- On both occasions, Roe omitted that Doe went out into the hall to get her water and
  omitted the fact that she and Mr. Doe spoke for some time after she finished performing
  oral sex.

167.    J.B. told Ms. Raimondo that he had been told he would be called back for an

interview but never was.  He asked Ms. Raimondo whether the decision was final or whether

instead there could be a retrial because Ms. Roe had not been truthful.

43

168.    Three days later, on October 14, J.B. handwrote a statement to be included with Mr. Doe's appeal.  In it he confirmed:

- That he and Roe had been "best friends" until this incident.

- That he had served as Ms. Roe's support person during her interview with Mr. Nolan.

- That he was merely "an acquaintance" of Mr. Doe.

- That Ms. Roe told him Mr. Doe "asked her to 'go down' on him and that she agreed to do so."

- That Mr. Nolan "told [him] that [he] would have a one-on-one interview with him and that he would call [him] back" but that he never did.

- That he was "shocked" when he learned Mr. Doe had been expelled "since I know [Ms. Roe] provided false testimony."

- That he felt "morally compelled to come forward at this time" despite his friendship with Ms. Roe.

169.    Mr. Doe's appeal also attached a statement from H.H., a female student who was "friends with both [Mr. Doe] and [Ms. Roe]."  H.H. testified that she spoke with Ms. Roe not long before Ms. Roe went to Mr. Doe's room and that Ms. Doe "did not appear drunk or 'crossfaded' during our conversation."  Ms. Roe's "speech was normal" when she "told [H.H.] that evening [that] she was going to hang out with [Mr. Doe]."

170.    H.H. "understood the purpose" of the meeting "was to hook up with" Mr. Doe. H.H. further testified that, when Ms. Roe asked Mr. Doe to stop having sex with her, he "asked" her if she would "'go down on him.'"  According to H.H., Ms. Roe "never said it was unconsensual [sic], only that she was uncomfortable."

171.    H.H. testified that, during the investigation, she gave a statement to the investigator, Mr. Nolan.  She was told she would be permitted to review and correct that statement later in the investigation, but she was never given the opportunity to do so.

44

172.    Mr. Doe's appeal also attached a letter from Dr. Judith Esman, a physician who is board certified in Internal Medicine, Physical Medicine and Rehabilitation.  She testified that "[t]he presentation of non-animated demeanor, slower speech patterns, or stoicism, are not in and of themselves indicative of alcohol and/or marijuana use, nor are they indicative of incapacitation.  They are subjective observations that would normally require significant familiarity with a person's normal presentation in order to detect."  Dr. Esman expressly contrasted these "subjective" indicia of intoxication with "objectively identifiable" ones "such as vomiting, slurred speech, or loss of balance."

173.    Mr. Doe also appealed the severity of his sanction.  He noted that the Policy provides a range of punishments for sexual assault, from suspension to expulsion, and argued that expulsion—the most severe sanction available—was inappropriate in a case such as his.

174.    Mr. Doe's appeal was denied by Oberlin on November 21, 2016.  Oberlin rejected the testimony of J.B. on the ground that it "did not add new material that was not shared in other ways" and it "did not challenge the factors that led to the determination" that Doe should have known Roe was incapacitated.  And it rejected the statement of H.H. on the ground that her uncorrected statement had been included in the investigative report and she could have testified as a witness at the hearing.  Oberlin failed to explain why evidence of Roe's dishonesty—which both statements plainly showed—did not undercut the credibility of Roe's claim that she was incapacitated that night.

175.    Oberlin rejected the testimony of Dr. Esman as a basis for granting the appeal because she "was not there to examine anyone the night of the incident and has never met the reporting party."  Oberlin failed to acknowledge the obvious relevance of Dr. Esman's

45

testimony—that the only outward signs of intoxication testified to by Roe's friends were signs that only those intimately familiar with Roe would recognize.

176.    Oberlin also rejected, with almost no explanation, Mr. Doe's argument that expulsion was not appropriate in this particular case.  Its only basis for upholding Mr. Doe's sanction was that the policy states that sexual assault "may" result in an expulsion and expulsion "fits . . . with" how Oberlin has punished similar incidents.  It failed to explain, in any way, why the specifics of Mr. Doe's violation merited expulsion instead of suspension.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

177.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

178.    At all times relevant hereto, a contractual relationship existed between Oberlin College and John Doe.

179.    Oberlin College's Policy, and its public explanations of the meaning of that Policy in places like the OEDI website, were a part of that contract.  Under that contract, Oberlin was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, and in resolving appeals.

180.    Oberlin College breached this contract with John Doe by failing to comply with the Policy in at least the following ways:

**A. Definition of Incapacitation**

181.    Oberlin failed to apply the Policy's definition of "incapacitation" in finding Mr. Doe responsible for sexual assault.  The Policy defines incapacitation as a state "where an

individual cannot make an informed and rational decision" or is "physically helpless."  Policy at 20.  It exists when one's level of intoxication affects "decision-making ability," "awareness of consequences," "ability to make informed judgments" or the "capacity to appreciate the nature and quality of [an] act."  *Id.* at 21.  It describes an "extreme[]" level of intoxication that makes a person unable "to control their body" or to "understand who they are or what they are doing."[37]

182.    To find a student responsible for sexual assault based on incapacitation, it must be apparent to the student, or a reasonable, sober observer in the student's shoes, that his or her sexual partner was incapacitated.  Policy at 21.

183.    There was no evidence presented at Mr. Doe's hearing tending to show that Ms. Roe was incapacitated on the morning of February 28, 2016.  Her friends testified that she was intoxicated to some degree, but none of them testified that she seemed unable to control her body, unable to make decisions for herself, or unable to appreciate where she was and what she was doing.  They testified only to a level of intoxication short of incapacitation.

184.    Even if Ms. Roe had actually been incapacitated (and she was not), there was no evidence presented at Mr. Doe's hearing from which he, or a reasonable person in his shoes, could have reached that conclusion.  By her own admission, the only outward indicator to Mr. Doe of Ms. Roe's level of intoxication was her statement, "I am not sober," which she indisputably made after (1) texting with Mr. Doe for more than 30 minutes with just a single typo, (2) walking to his room, and (3) engaging in approximately 45 minutes of talking, kissing, and sexual intercourse with him.  That statement conveyed, at most, that Ms. Roe was intoxicated to some degree.  It did not, either as a logical matter or a practical matter, convey anything about the specific level of her intoxication, let alone that it was "extreme[]."

---

[37] *See* http://new.oberlin.edu/office/equity-diversity-inclusion/sexual-misconduct/what-is-consent.dot (last visited January 25, 2018) (emphasis added).

185.    In finding Mr. Doe responsible for sexual assault, the hearing panel likewise pointed to just a single item from which, it contends, Mr. Doe should have concluded that Ms. Roe was incapacitated:  Her statement that she was not sober.

186.    In finding Mr. Doe responsible based on that single statement, the hearing panel necessarily conflated "incapacitation" with intoxication, and therefore failed to apply the Policy's definition of incapacitation.

**B. Application of the Preponderance Standard**

187.    Oberlin also failed to apply the preponderance of the evidence standard in concluding that the evidence tending to show Ms. Roe could not consent to oral sex outweighed the evidence showing that she could, and did.

188.    As explained immediately above, the hearing panel heard evidence tending to show only that Ms. Roe was intoxicated, not that she was incapacitated.  Likewise, it heard evidence showing that Mr. Doe, or a reasonable person in his shoes, could have known only that Ms. Roe was intoxicated, not that she was allegedly incapacitated.

189.    The panel also heard a large amount of evidence that called Ms. Roe's credibility into question and therefore undermined her claims, including her claim to have been incapacitated when she was with Mr. Doe.  Among other things:

- Ms. Roe told friends, and wrote in her diary, that John Doe "asked" her to perform oral sex on him, but denied this at hearing multiple times, claiming instead that he physically forced her to perform oral sex on him.

- Ms. Roe altered between testifying that she told John Doe twice that she was not sober and testifying that she said so only once.

- Ms. Roe told an inherently implausible story about Mr. Doe's removal of his condom.  She claimed that, in response to her statement that the sex was painful, Mr. Doe removed the condom yet immediately continued having sex with her. She did so for an obvious reason—to elide the fact that Mr. Doe covered himself

with a towel and went out into the hallway to get a drink of water for her, an act that could not be reconciled with the picture she needed to paint of him.

- Ms. Roe confided to a friend that she was upset at having had sex with Mr. Doe because she was interested in another person.

190. Even more evidence of Ms. Roe's lack of credibility was presented to Oberlin in John Doe's appeal.  Ms. Roe's close friend, *who had actually accompanied Ms. Roe to her interview with Mr. Nolan as her support person*, told Ms. Raimondo directly, and submitted evidence for Mr. Doe's appeal, explaining that the story Ms. Roe told to Mr. Nolan was different in significant respects from the story she had told him before then.

191. In finding that Ms. Roe was incapacitated and that John Doe should have known that, despite the fact that the evidence showed (1) only that she was intoxicated, (2) that the only outward indicator to Doe of her insobriety was the bare statement "I am not sober," and (3) that Jane Roe simply was not credible, the hearing panel found John Doe responsible for sexual assault based on less than a preponderance of the evidence.

**C. Explanation of the Panel's Rationale**

192. The Policy promises that "[t]he findings of the Hearing Panel will be documented in writing by the Hearing Panel chair" and that those findings "will detail the findings of fact and the basis/rationale for the decision of the Hearing Panel."  Policy at 46.

193. As explained above, the hearing panel found that, based on the single statement "I am not sober," John Doe should have concluded that Ms. Roe was "extremely drunk," *i.e.*, incapacitated.

194. The hearing panel, however, failed to explain how Mr. Doe, or anyone in his shoes, should conclude from the statement "I am not sober" anything about a person's level of sobriety.  They did not explain the chain of reasoning that Mr. Doe should have gone through—a

49

chain that they themselves presumably went through, or at least should have if they were to

punish Mr. Doe for not doing so.  They simply asserted, without explanation, that Mr. Doe

should have concluded Ms. Roe was incapacitated from that bare statement.

### D. Appeal of the Severity of the Sanction

195.    Implicit in every contract is a covenant of good faith and fair dealing that requires

parties to execute their duties under the contract in good faith.

196.    Oberlin violated the covenant in rejecting Mr. Doe's appeal based on the severity

of his sanction.

197.    The Policy states that any student found responsible for sexual assault "may

receive a sanction ranging from suspension to expulsion."  *Id.* at 45.

198.    The Policy allows students to appeal sanctions that are "significantly

disproportionate to the violation."  Policy at 49.

199.    The right to appeal a sexual assault sanction based on its severity would be

meaningless if a sanction within the permissible range could never be "significantly

disproportionate to the violation."

200.    Yet in rejecting Mr. Doe's appeal based on the severity of the sanction, Oberlin

upheld the sanction because "[t]he sanction for expulsion for sexual assault fits within" the range

specified in the Policy.

201.    In doing so, Oberlin adopted an interpretation of its Policy that effectively

nullifies a sexual assault respondent's contractual right to appeal the severity of his or her

sanction.

202.    As a result of each of Oberlin College's breach of contract, and as a direct and

proximate cause thereof, John Doe has been seriously and irreparably damaged in the following

ways, among others: he has endured extreme emotional and psychological suffering as a result of the College's one-sided treatment of the false sexual assault charges against him; he lost the ability to obtain college credit during the Fall 2016 semester; his attainment of a college degree, if any, has been delayed, thereby delaying the time at which he can begin a career and shortening the length of that career; his academic records from Oberlin will reflect his expulsion, handicapping his ability to be accepted at a transfer school or graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

203.    For all of these reasons, Oberlin College is liable to John Doe for breach of contract and all damages arising out of that breach.

## COUNT II – VIOLATION OF TITLE IX (20 U.S.C. § 1681)

204.    Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

205.    Oberlin receives federal funding, including in the form of federal student loans given to students.

206.    Because it receives federal funding, Oberlin is subject to the requirements of Title IX.

207.    Title IX prohibits gender discrimination in the educational setting.

208.    The egregious misapplication of the Policy's definition of "incapacitation"; the complete lack of evidence that Ms. Roe exhibited any signs of incapacitation to Mr. Doe; the complete lack of evidence that Ms. Roe was in fact incapacitated; and the serious credibility issues that emerged with respect to Ms. Roe's testimony, cast serious doubt on Oberlin's finding of responsibility and show that the decision against him was based on his gender and the gender of his accuser.

209.    Gender bias pervades the process by which Oberlin investigates and adjudicates sexual misconduct claims.  The Policy, and the training received by those who implement it, was the product of 18 months of work occasioned by the complaint of a female Oberlin student who claimed that her adjudication process took too long and punished her assailant too leniently.  Its architect and chief implementer, Meredith Raimondo, designed a "survivor-centered process" which, in her words, was motivated by her views on feminism.  One of its primary goals is to eliminate "rape culture," the chief symptom of which, according to multiple facets of Oberlin society, including at least some of its Title IX adjudicators, is to entertain any type of doubt about the truthfulness of a sexual assault claimant.  Ms. Raimondo herself has stated that the use of the term "grey areas" to describe situations not involving predators or sex with someone who is fundamentally unconscious discredits "women's experiences of violence" in particular.

210.    Consistent with those beliefs, every single respondent put through Oberlin's formal sexual misconduct resolution process in the Fall of 2015 and at least part of the Spring 2016 semesters was found responsible for at least one of the charges against him.  Upon information and belief, the vast majority of these respondents were men, and the vast majority of their accusers were women.

211.    Moreover, Oberlin initiated its investigation and adjudication of the allegations against Mr. Doe in the shadow of (1) OCR investigations—of now more than 200 colleges and universities nationwide—into how colleges and universities handle allegations of sexual assault; and (2) innumerable reports covered in the national media that suggest the pervasive nature of sexual assault committed by male students on college campuses throughout the nation.  Indeed, Mr. Doe's investigation was launched less than four months after *Oberlin itself* was made the subject of a formal OCR investigation, a fact which received local media attention.  As a reaction

52

to the scrutiny of these OCR investigations and these national stories, and in particular in response to its own recent, very public placement on a list of schools being investigated by the federal government, Oberlin was motivated to be perceived as aggressively addressing women's claims of sexual assault on its campus.  It has therefore treated male students accused of sexual misconduct by female students, including Mr. Doe, more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

212.    The effects of gender bias were manifested in the proceedings against Mr. Doe in other ways as well.

213.    Ms. Raimondo, as the Title IX Coordinator at the time the investigation against Mr. Doe was launched, and as the supervisor of the Interim Title IX Coordinator after July 1, 2016, played a central role in the investigation and adjudication of Mr. Doe's claims.  She provided evidence, in the form of summaries of interviews she conducted, to Mr. Nolan, the investigator.

214.    Despite the fact that a female student's complaint about the length of her process triggered an entire overhaul of Oberlin's sexual misconduct policy and procedures, John Doe's investigation lasted far longer than the target of 20 days promised in the Policy, and Ms. Raimondo offered John Doe no relief when he begged her for help in speeding its resolution after the investigator went radio silent.  As the October 2012 complaint of the above-mentioned female student makes clear, John Doe would not have received such treatment if he were a female.

215.    In addition, the Title IX Team appointed Mr. Doe a biased advisor to support him during his hearing.  That advisor, Dean Bautista, had attended a training that taught that doubting

53

a sexual assault victim is a symptom of "rape culture."  He left Mr. Doe's hearing early.  And

just two weeks after Mr. Doe's hearing, he would retweet, "To survivors everywhere, we believe

you."

216.    Oberlin has engaged in a pattern of unfair investigations and adjudications

resulting in serious sanctions being imposed on male students.  Upon information and belief,

Oberlin has not acted comparably with respect to allegations of sexual misconduct made against

female students.

217.    As a direct result of Oberlin College's violation of Title IX, and as a direct and

proximate cause thereof, John Doe has been seriously and irreparably damaged in the following

ways, among others: he has endured extreme emotional and psychological suffering as a result of

the College's one-sided treatment of the false sexual assault charges against him; he lost the

ability to obtain college credit during the Fall 2016 semester; his attainment of a college degree,

if any, will be delayed, thereby delaying the time at which he can begin a career and shortening

the length of that career; his academic records from Oberlin will reflect his expulsion,

handicapping his ability to be accepted at a transfer school or graduate school or to secure his

desired employment; and he will suffer a permanent reduction in lifetime earnings.

218.    Accordingly, Defendant Oberlin College is liable to Mr. Doe for violations of

Title IX and for all damages arising out of that violation.

## COUNT III - NEGLIGENCE

219.    Plaintiff incorporates by reference all of the preceding paragraphs of this

Complaint as though fully set forth herein.

220.    In conducting its investigation and adjudication of Jane Roe's complaint against

John Doe, Oberlin College owed a common law duty to John Doe to exercise reasonable care,

with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions, as well as John Doe's various liberty and property rights and interests generally.

221.    Through the acts set forth above, Oberlin College, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of John Doe.

222.    In particular, Oberlin has negligently trained and supervised the individuals it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement the Policy.  Upon information and belief, those individuals are trained to implement the Policy's goal of combating "rape culture," a chief element of which, in the Oberlin community, is to express any doubt about the veracity of sexual assault claimants.  Oberlin, furthermore, negligently trained the members of John Doe's hearing panel in the Policy's definition of "incapacitation" and in applying the preponderance of the evidence standard.

223.    As a direct result of Oberlin College's negligence, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has endured extreme emotional and psychological suffering as a result of the College's one-sided treatment of the false sexual assault charges against him; he lost the ability to obtain college credit during the Fall 2016 semester; his attainment of a college degree, if any, will be delayed, thereby delaying the time at which he can begin a career and the shortening of the length of that career; his academic records from Oberlin will reflect his expulsion, handicapping his ability to be accepted at a transfer school or graduate school or to secure his desired employment; and he will suffer a permanent reduction in lifetime earnings.

224.    Accordingly, Oberlin College is liable to John Doe for negligence and for all damages arising out of that violation.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against Defendant Oberlin College, and order relief against Defendant as follows:

a.  That this Court issue preliminary and permanent injunctive relief, restraining Oberlin College from (1) reflecting, in any manner whatsoever, in Doe's records or elsewhere, the findings or sanctions imposed upon John Doe based on its adjudication of Roe's complaint; and (2) maintaining any records related to that sanction, as it was the product of the College's erroneous finding that he violated the Policy, which was itself the product of a flawed disciplinary process; and

b.  That Oberlin College be ordered to pay compensatory damages as appropriate to compensate John Doe for his losses caused by the College's misconduct, in the amount of $1,000,000; and

c.  That Oberlin College be ordered to pay punitive damages, in the amount of $2,000,000; and

d.  That this Court award John Doe his costs and expenses incurred in this action, as well as such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  January 26, 2018

  /s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (Ohio Bar No. 83080)
KAISERDILLON PLLC
1401 K Street NW
Suite 600
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

# Exhibit 1

Case: 1:17-cv-01335-SO  Doc #: 21-2  Filed:  02/07/18  60 of 63.  PageID #: 528

Special Task Force Revises Oberlin's Sexual Offense Policy | Fearless and Loathing
Case: 1:17-cv-01335-SO  Doc #: 14-1  Filed:  01/26/18  2 of 5.  PageID #: 418

9/7/17, 4:43 PM

# Special Task Force Revises Oberlin's Sexual Offense Policy

By [Zoey Memmert-Miller](#), March 1, 2014

The first time I heard about a case of sexual assault on Oberlin's campus was during the fall of my junior year; an upset friend told another good friend and me about an incident concerning someone she was close to. We stood in front of Mudd Ramp, the beauty of the starry wintry night a sharp contrast to the anger, disgust, sadness and disbelief in each of our voices as we talked about what had happened.

It's extremely surprising to me that this is the first case I heard about, especially given the [national statistics](#): "1 in 5 women are victims of completed or attempted sexual assault while in college", and "approximately 6.1 percent of males were victims of completed or attempted sexual assault during college."

These staggering statistics have caught the public eye, and have helped to spark new conversations and create new policies around the issue of sexual assault on college and university campuses. On April 4, 2011 the federal Department of Education's Office of Civil Rights published a nineteen-page  "Dear Colleague" letter, the first federal effort to outline and emphasize the importance of federal policies around sexual assault and sexual violence. This was followed by the passage of the Campus Sexual Violence Elimination (SaVE) act, legislation that requires greater transparency, accountability and education on the part of campuses in dealing with cases of sexual assault. Just this January, the White House formed a Task Force to Protect Students from Sexual Assault.

These national steps provided partial inspiration for re-examining Oberlin's Sexual Offense Policy, according to Professor Meredith Raimondo. She is part of an Oberlin task force, composed of both students and faculty and created in December 2012 for the purpose of updating the policy to match new national and campus-wide discourse around sexual assault. The [new draft of the policy](#), now titled the Sexual Misconduct Policy, was released about two weeks ago, and this past Tuesday and Thursday Student Senate held open meetings for students to discuss their thoughts on it.

There are several changes in the policy besides the new name. One of the largest includes revised requirements around the duty to report, which is now called the "requirement to report". Under the old policy, all members of the staff and student body would face judicial measures if they failed to report information they heard pertaining to cases of sexual assault/violence. The new policy breaks the Oberlin community into three groups of responders. Responsible employees are required to report, while other employees are expected to. Students, on the other hand, are strongly encouraged to report but will not face judiciary action should they choose to keep a friend's experience confidential.

The definition of consent has also been revised, with stricter standards—effective consent as defined by the new policy is "based on mutually understandable communication that clearly indicates a willingness to engage in sexual activity." The age of consent, the use of force or coercion or the incapacitation of one or more partners automatically creates conditions in which effective consent is not possible.

There are also more options for resolution of reported cases. Title IX reviews will ensure support and safety measures for survivors, who can then choose between two types of resolutions. One, a formal resolution, will consist of a hearing of the accused by one or three trained administrators. The other, an informal resolution, will result in no disciplinary action but the discrimination will be addressed through various other measures. One large emphasis of the policy, Professor Raimondo said at Tuesday's open forum, is to ensure that the needs of survivors are met and their psychological and physical safety is guaranteed, as well as ensure measures are taken to make them feel comfortable on campus and that they receive the support they may need academically to complete their college degree.

Other changes include widening the scope of the policy to cover a larger portion of the Oberlin community and broaden the types of actions defined as sexual misconduct. There will be mandatory training on sexual assault for incoming students as well as expectations of professional development around these issues by faculty and staff. The new policy also stressed the importance of gender-neutral language, and stresses greater transparency around the judicial process and the consequences of harassment and sexual assault. Professor Raimondo remarked at the Sexual Misconduct Policy Discussion that a broad goal of the revisions is to steer the conversation away from preventative measures that can be taken and instead provide a clear understanding of rape culture, and the actions that can be taken to eradicate this culture.

The Task Force was created in response to wide dissatisfaction with the previous policy. Members were chosen based on their professional roles and on their history of work on issues relevant to the issue of sexual violence. The task force started the revision process by completing a line-by-line review of the previ-

Special Task Force Revises Oberlin's Sexual-Offense Policy | Fearless and Loathing

9/7/17, 4:43 PM

ous policy. It researched the policies that were effective on other campuses, and worked with national consultants who are experts on Title IX compliance. They reached out to the campus and held open listening sessions, as well as individual meetings with concerned students. They held a retreat with key staff members who implement the policy, and reviewed the results of confidential audits done by consultants with individuals involved in cases at Oberlin, to see how the policy was and wasn't working.

The plan for the future of the policy is straightforward. The Task Force plans on incorporating student feedback from this week's meetings into the new draft of the policy, as well as feedback from Student Senate, the Administrative and Professional Staff Council, and the General Faculty Council. They have also sent the policy to legal consultants for review. On March 19th, they will introduce it to the General Faculty, a body whose approval is needed for the policy's implementation.

Sometimes it is easy to think of Oberlin as a progressive bubble full of love and acceptance. While there are many aspects of truth to that idea, its simplicity allows us to ignore the darker issues at play on campus, sexual misconduct being just one. Since that night during my junior year, the amount of cases I've heard about, the amount of cases involving people I know and love, has deeply upset and angered me. Hopefully the generations of Obies that come after us will continue to think critically about this issue, and continue this task force's work towards creating a campus culture based around consent.

*Questions or concerns about the new policy? Contact members of the task force:*

Eric Estes, Vice President of student affairs and Dean of Students; eestes@oberlin.edu
Mary K. Gray, Associate Dean for Student Academic Affairs; mgray@oberlin.edu
Laura Nuckols '14; lnuckols@oberlin.edu
Tania Mukherjeev '14; tania.mukherjee@oberlin.edu
Cuyler Otsuka '14; cotsuka@oberlin.edu
Meredith Raimondo, Associate Dean and Associate Professor of Comparative American Studies; mraimond@oberlin.edu

This entry was posted in News, News Stories, Zoey Memmert-Miller and tagged News on March 1, 2014 [http://www.fearlessandloathing.com/2014/03/special-task-force-revises-oberlins-sexual-offense-policy/] by Zoey Memmert-Miller.

Special Task Force Revises Oberlin's Sexual Offense Policy | Fearless and Loathing

9/7/17, 4:43 PM