## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-01335 |
| | ) | |
| v. | ) | |
| | ) | The Honorable Solomon Oliver, Jr. |
| OBERLIN COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### JOHN DOE'S OPPOSITION TO DEFENDANT OBERLIN COLLEGE'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPAINT

Justin Dillon
Christopher C. Muha
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, D.C. 20005
T: (202) 640-2850
F: (202) 280-1034
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

DATED:  April 6, 2018                    *Attorneys for John Doe*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

STATEMENT OF THE ISSUES ..................................................................................... v

SUMMARY OF THE ARGUMENT ................................................................................ 1

FACTUAL ALLEGATIONS ............................................................................................ 3

    A.   The Incident ........................................................................................................ 3

    B.   Gender Bias at Oberlin ...................................................................................... 4

ARGUMENT .................................................................................................................... 6

    I.    The Complaint States a Claim for Breach of Contract ..................................... 6

    II.   The Complaint States a Claim for a Title IX Violation .................................... 9

        A.   John Doe Has Cast Substantial Doubt on the Accuracy of the
             Outcome ........................................................................................................ 10

        B.   John Doe Has Pled Facts That Amply Support an Inference of
             Gender Bias .................................................................................................. 10

            1.   Evidence of Gender Bias ........................................................................ 10

            2.   The College's Efforts to Explain Away Its Gender Bias
               Fail ........................................................................................................ 15

    III.   The Complaint States a Claim for Negligence ............................................... 17

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Battista v. Lebanon Trotting Assn.* 538 F.2d 111 (6th Cir. 1976) ................................................. 19

*Central Realty Co. v. Clutter*, 62 Ohio St. 2d 411 (1980) ............................................................. 6

*Collick v. William Patterson Univ.*, No. 2:16-cv-00471,
    2016 WL 6824374 (D.N.J. Nov. 17, 2016) ...................................................................... 10, 15

*Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017) ........................................... 10, 14

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ...................................................... 10, 15

*Doe v. Case Western Reserve Univ.*, No. 1:17-cv-414,
    2017 WL 3840418 (N.D. Ohio Sept. 1, 2017) ................................................. 7, 10, 12, 18, 20

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ................................................. 10, 12, 14, 17

*Doe v. Cummins*, 662 Fed. App'x 437 (6th Cir. 2016) .................................................... 2, 10, 13

*Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336 (S.D. Fla. 2017) ......................................... 10, 14

*Doe v. Marymount Univ.*, No. 1:17-CV-401, 2018 WL 1352158
    (E.D. Va. Mar. 14, 2018) ........................................................................................... 10, 11, 14

*Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) .................................................... *passim*

*Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017) ....................................... 10, 14

*Doe v. The Trustees of the University of Pennsylvania*, No. 2:16-cv-05088-JP,
    2017 W 4049033 (E.D. Pa. Sept. 13, 2017) ........................................................................ 10, 13

*Doe v. Univ. of the South*, No. 4:09-CV-62, 2011 WL 1258104
    (E.D. Tenn. 2011) ......................................................................................................... 2, 18

*Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052, 2015 WL 4647996
    (W.D. Va. 2015) ................................................................................................................ 11, 12

*Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 WL 705886
    (S.D. Oh. February 5, 2018) ................................................................................................ 10

*Jeffers v. Olexo*, 43 Ohio St. 3d 140 (1989) ................................................................... 2, 18, 20

*King v. DePauw University*, No. 2:14-cv-70-WTL, 2014 WL 4197507
(S.D. Ind. 2014) ............................................................................................ 7, 8

*Lawrence v. Lorain Cty. Cmty. Coll.*, 713 N.E.2d 478 (1998) ................................... 19

*Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1991) .................................................. 6

*McDade v. Cleveland State University*, 2014-Ohio-4026, 2014 WL 4557015
(Ohio. Ct. App. 2014) ..................................................................................... 7

*Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St. 3d 75 (1984) ........................... 18

*Neal v. Colorado State Univ.-Pueblo*, No. 1:16-cv-873,
2017 WL 633045 (D. Colo. Feb. 16, 2017) .................................................. 10, 15

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81
(2d Cir. 2011) .......................................................................................... 18, 20

*Ritter v. Oklahoma City Univ.*, No. 5:16-cv-438, 2016 WL 3982554
(W.D. Okla. July 22, 2016) ............................................................................ 15

*Ray v. Wilmington College*, 667 N.E.2d 39, 42 (Ohio Ct. App. 1995) ........................ 7

*Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. Ct. App. 1981) ............... 18

*Savoy v. Univ. of Akron*, 15 N.E.3d 430 (Ohio Ct. App. 2014) ................................... 6

*Schaumleffel v. Muskingum Univ.*, 2018 WL 1173043
(S.D. Ohio March 6, 2018) ...................................................................... 7, 10, 12

*Starishevsky v. Hofstra Univ.*, 612 N.Y.S.2d 794 (Sup. Ct. 1994) ............................ 18

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137
(1996) ............................................................................................................. 19

*Trutschel v. Kettering Med. Ctr.*, 2009-Ohio-3302, ¶¶ 33-34, 2009 WL 1914549
(Ohio Ct. App. 2009) ...................................................................................... 19

*Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13
(D.S.D. June 16, 2016) ................................................................................... 18

*Univ. of Dayton*, No. 17-cv-134, 2018 WL 1393894
(S.D. Oh. Mar. 20, 2018) ............................................................................... 19

*Valente v. University of Dayton*, 438 Fed. Appx. 381 (6th Cir. 2011) ......................... 7

*Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014) ....................................................... 14

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) .......................................................9, 10, 11

## STATEMENT OF THE ISSUES

1. Whether Oberlin breached its contract with John Doe, and the covenant inherent in it, when (among other things) it concluded, based *solely* on Jane Roe's statement "I am not sober right now," that he should have concluded she was "incapacitated"—which Oberlin defines as being so "extremely drunk or extremely high" that she was "unable to control [her] body or no longer understand[] who [she was] with or what [she was] doing."

2. Whether the following facts, among others, support an inference of gender bias when all reasonable inferences are drawn in their favor:

   - That the chief architect of Oberlin's Sexual Misconduct Policy (the "Policy"), Meredith Raimondo, implements the Policy "as a feminist committed to survivor-centered processes" and has stated that referring to cases like John Doe's as "grey areas" of consent discredits "women's experiences of violence in particular."

   - That Ms. Raimondo headed the team that decided whether to send Mr. Doe's case through its formal resolution process.

   - That Oberlin found every accused student put through its formal resolution process, all or most of whom were male, responsible for sexual misconduct in that same academic year.

   - That Oberlin had come under "systemic investigation" by the Education Department's Office for Civil Rights ("OCR") for its handling of sexual assault just three months before Doe was charged.

   - That Oberlin for years was under relentless pressure to appear tough at all costs on sexual assault, and in particular on assault claims brought by women against men.

3. Whether it is foreseeable that private colleges will have to discipline their students and that doing so carries significant consequences to them, such that they owe their students a common law duty of care in doing so.

## SUMMARY OF THE ARGUMENT

John Doe was expelled from Oberlin College ("Oberlin" or the "College") after it said he sexually assaulted Jane Roe, despite overwhelming evidence to the contrary.  Like most universities, Oberlin does not bar its students from engaging in drunken sex; rather, its Policy forbids sexual contact only when one's partner reaches an extreme level of intoxication known as "incapacitation," "a state where an individual . . . lack[s] conscious knowledge of the nature of the act . . . and/or is physically helpless.'"  Compl. ¶ 20 (quoting Policy at 20-21).  Incapacitation "'describes a level of intoxication in which a person is unable to control their body or no longer understands who they are with or what they are doing.'"  Compl. ¶ 21 (quoting website of Oberlin's Office of Equity, Diversity and Inclusion).  It is a state of being "*extremely* drunk or *extremely* high."  *Id.* (emphasis added).  To violate the Policy, a student must know, or reasonably ought to have known, that his partner was in that extreme state.  Compl. ¶ 22.

Doe has alleged—and amply supported with facts—that Oberlin uncovered almost no evidence that Roe was ever incapacitated on the night she had sex with John Doe, *id.* ¶ 183, and no evidence whatsoever that, if she were, John Doe had any way of knowing that, *id.* ¶ 184.  On that latter point there is no credible room for dispute: **Jane Roe herself, at her sexual misconduct hearing, expressly testified that she manifested *no* outward signs of intoxication to Doe during the 45 minutes that she and Doe talked, kissed, and had intercourse**.  *Id.*  Her testimony—*hers*, not his—was that after those 45 minutes, she told him, "I am not sober right now," and that this was literally the only indication to him of any kind that she was less than completely sober.  *Id.*  Despite that, and without ever explaining how "I am not sober" should have told Mr. Doe that Ms. Roe was *incapacitated*, Oberlin said that Roe was incapacitated and Doe should have known it and imposed upon him its most severe sanction.  *Id.* ¶ 185.

1

In doing so, Oberlin violated Doe's common law and statutory rights.  It violated four contractual protections it promised Doe in the Policy: to punish him only if his partner were incapacitated and he had reason to know it, *id.* ¶¶ 181-86; to punish him only if a *preponderance* of the evidence showed those things, *id.* ¶¶ 187-91; to reduce to writing the rationale behind any such findings, *id.* ¶¶ 192-94; and to allow him meaningfully to appeal the severity of his sanction, *id.* ¶¶ 195-203.  It lacked any discretion to violate those provisions.  The Motion must be denied as to Count I.

The Complaint alleges a host of facts showing that gender bias played a role in Doe's expulsion, including that the Policy's architect and chief implementer, Meredith Raimondo, stated that referring to cases like Mr. Doe's as "grey areas" of consent discredits "women's experiences of violence in particular," *id.* ¶ 59, that she led the team that decided to send Mr. Doe's case through formal adjudication, *id.* ¶ 27, that Oberlin came under active investigation by OCR just three months before that formal process began, *id.* ¶ 51; and that that process invariably resulted in findings of guilt that academic year 2015-16, *id.* ¶¶ 52-54.  *Doe v. Cummins*, 662 Fed. Appx. 437, 453 (6th Cir. 2016) (active investigation by OCR supports inference of gender bias).  These facts and others amply support the particularized inference of gender bias required to proceed under Title IX.  *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018).  The Motion should be denied as to Count II as well.

Doe's negligence claim (Count III) survives because Oberlin has an independent duty, apart from its contractual promises, not to expel students in an arbitrary manner.  *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 142 (1989); *Doe v. Univ. of the South*, No. 4:09-CV-62, 2011 WL 1258104 at *21 (E.D. Tenn. 2011) (denying summary judgment on male student's negligence

claim).  It breached that duty when it instituted a regime that invariably finds respondents guilty and negligently trained that regime's administrators.  Am. Compl. ¶¶ 35, 54, 209, 215, 219-24.

## FACTUAL ALLEGATIONS

### A.    The Incident

In December 2015, John Doe and Jane Roe met at a party and danced together, then had consensual sex the next morning.  *Id*. ¶ 69.  They had little interaction after that until the morning of February 28, 2016, *id.* ¶ 70, when Doe texted Roe to see what she was doing, *id.* ¶ 72.  They texted back and forth for 30 minutes, and Roe asked if she could come to Doe's room.  *Id.*  Roe's responses were prompt and coherent and she made just a single typo.  *Id.*

Minutes before going to Doe's room, Roe was with a friend who knew her well.  *Id.* ¶ 84.  That friend asked her, "You good?" when she learned Roe intended to go to Doe's room, and was satisfied with Roe's answer: "Yeah."  *Id.* ¶¶ 74, 89, 141.  She then watched Roe "mosey" to Doe's room by herself.  *Id.* ¶ 89.  Roe testified that she exhibited no outward signs of intoxication in Doe's room; she testified to being coherent, in control of her body, and responding in real time to what was taking place.  *Id.* ¶¶ 90-103.  When later asked at the hearing how Doe might have known she was incapacitated, she pointed to just a single thing: her statement, "I am not very sober right now."  *Id.* ¶ 100.

Before the hearing, Roe testified on at least three occasions that, after engaging in intercourse for some time, Doe asked her to perform oral sex on him.  She told that to friends after the incident, *id.* ¶ 169, she told it to Oberlin's investigator, Josh Nolan, when he interviewed her, *id.* ¶¶ 100, 168, and she wrote it in her journal on March 1, *id.* ¶ 119.  At the hearing, however, when she was directly asked whether Doe had requested that she perform oral sex, she responded, "No." *Id.* ¶ 126.  She then claimed, *for the first time*, that Doe had grabbed

her neck and forced her mouth on his penis.  *Id.*  At the hearing, Mr. Nolan identified this change as the sole contradiction made by either party vis-à-vis their investigation testimony.  *Id.* ¶ 149.

A friend of Roe's testified that, after the incident, Roe was "'disappointed and upset" that she had chosen to hook up with Doe, as she was interested in someone else.  *Id.* ¶¶ 116, 140. That friend testified to no obvious outwards signs of Roe's intoxication and described a lengthy, coherent interaction inconsistent with any notion that Roe was incapacitated.  *Id.* ¶¶ 117, 138-39.

The evidence collected in the investigation of Roe's claims, and the testimony given at the hearing, thus showed that no one who saw Roe that night thought she was incapacitated *before* she went to Doe's room, *while* she was in Doe's room, and immediately *after* she left Doe's room.  And Roe's hearing testimony, which contradicted her repeated testimony before the hearing on a critical fact, showed that she was not credible.  Yet Oberlin nevertheless found that Roe was incapacitated and Doe should have known it and expelled him.  It did so because of the unfair and gender-biased regime Oberlin has set up to resolve claims of sexual misconduct.

## B.      Gender Bias at Oberlin

Oberlin's Title IX enforcement regime, particularly at the time that the charges against Doe were investigated and adjudicated, was rife with gender bias.  The Amended Complaint alleges a number of facts showing that Doe's expulsion was the product of gender bias:

- The current Policy was created when a female student publicly complained that her male assailant wasn't punished severely enough and the process took too long.  *Id*. ¶ 209.

- Oberlin responded by appointing a task force that spent 18 months revamping its sexual misconduct enforcement regime.  *Id.* ¶¶ 37-39.

- When Doe later lamented to Meredith Raimondo that his process had far exceeded Oberlin's timelines for resolution of complaints and explained the extreme psychological and physical toll it was taking on him, his plea fell on deaf ears.  *Id.* ¶¶ 81-82.

4

- The chief architect of the new Policy, Ms. Raimondo, served as Oberlin's first Title IX Coordinator under that policy, a position she held until July of 2016, after which time she supervised the College's interim Title IX Coordinator.  *Id.* ¶ 38.

- In May 2015, while she was Title IX Coordinator, Ms. Raimondo stated, "I come to this work as a feminist committed to survivor-centered processes," betraying a gendered view of Title IX enforcement and of the "survivors" the process was meant to benefit.  *Id.* ¶ 59.

- She elaborated on those views on a public panel the next month, stating that she is "uncomfortable" referring to the "middle category" of sexual assault cases—those involving neither predators nor someone who is fundamentally unconscious—as "grey areas" of consent "'because I think it's too often used to discredit particularly women's experiences of violence.'"  *Id.* ¶ 59.

- She stated on that same panel that Title IX has served "to 'visibilize [*sic*] gender-based harms and the way in which that has predominantly affected women,'" confirming that women are the prototypical survivors around whom the process is centered.  *Id.* ¶ 57.

- She also stated on that panel that Title IX disciplinary hearings "'open the possibility of clarifying that most men in college don't assault people,'" confirming that men are the prototypical respondents in such cases.  *Id.* ¶ 58.

- She further identified the first goal of "a Title IX hearing at Oberlin . . . is to provide a safe supporting space for someone to ask, 'What are the harms you experienced and how can we address them," not to determine whether such harm occurred.  *Id.* ¶ 58.

- According to Ms. Raimondo, one of the primary goals of this gendered enforcement regime is the elimination of "rape culture," *id.* ¶ 39, showing that term has gendered overtones at Oberlin.

- The chief characteristic of the fight against "rape culture" at Oberlin, as evidenced by faculty resource guides, its Counseling Center, and student opinion leaders, is an unwavering belief in the truth of sexual misconduct allegations.  *Id.* ¶¶ 40-47.

- Three months before Roe accused Doe of sexual assault, Oberlin came under "systemic investigation" of its response to claims of sexual misconduct by OCR based on its handling of a sexual assault allegation on its campus.  *Id.* ¶ 48.

- It was widely known at the time that OCR's head, Catherine Lhamon, was enforcing a gendered view of sexual assault, resulting in pressure upon schools to find in favor of women accusing men of sexual assault.  *Id.* ¶¶ 49-51.  It was also widely known that she was threatening to revoke schools' federal funding if they failed to comply.  *Id.* ¶ 50.

- In the academic year in which that investigation was opened (and in which John Doe was accused of sexual assault), **every single respondent put through Oberlin's formal**

5

**adjudication process was found responsible on at least one charge.**  Most of those respondents, if not all of them, were men.  *Id.* ¶¶ 54, 210.

- As the head of Oberlin's Title IX Team, Ms. Raimondo led the group that decided which respondents would and would not go through that formal adjudication process.  *Id.* ¶ 27.

- When Doe asked for an advisor to assist him at his hearing he was given someone who retweeted the following statement just *two weeks* after Doe's hearing: "To survivors everywhere, we believe you."  *Id.* ¶¶ 61-65, 123-24.

- John Doe was found responsible for assaulting Jane Roe despite overwhelming evidence to the contrary and her contradictory testimony at the hearing.  *Id.* ¶¶ 181-91.

## ARGUMENT

## I.  THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT.

John Doe's Complaint states an obvious claim for breach of contract.  Under Ohio law, his relationship to the College is contractual in nature, and the Policy and other materials the College publishes for its students supply the terms of the contract.  *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 436 (Ohio Ct. App. 2014).[1]  As explained above, and more fully in the Complaint, the College violated three provisions of the Policy in expelling Doe:  It failed to apply its definition of "incapacitation" to Roe's level of sobriety and Doe's knowledge of her sobriety, *id.* ¶¶ 181-86; it failed to find Doe responsible only if a preponderance of evidence showed it, *id.* ¶¶ 187-91; and it then failed to explain how Roe's lone statement, "I am not sober right now," could have communicated to Doe that she was incapacitated, *id.* ¶¶ 192-94.

Oberlin tries to sidestep the claim in two ways.  *First*, it tries to argue that courts review school discipline decisions only for abuse of discretion.  Docket No. 28-1 at 15-16.  Even if that

---

[1] Ohio adheres to the "age-old maxim" of contract law that ambiguous contract language is construed against the party who drafted it and in favor of the party who did not.  *Central Realty Co. v. Clutter*, 62 Ohio St. 2d 411, 413 (1980); *see Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1991) (applying similar maxim to interpretation of contracts based on student handbooks).  Any ambiguity in the contractual provisions at issue must be construed in favor of John Doe.

were the appropriate standard of review (it is not),[2] Mr. Doe has pled facts that overwhelmingly show just such abuse.  Doe has pled, with ample support, that there was almost no evidence of Roe's incapacitation at all, and certainly no evidence that he could have been aware of it. Compl. ¶¶ 181-86.  It is undisputed that the College never explained how Roe's lone statement (especially after 45 minutes of talking and sexual activity) could lead anyone to conclude she was *incapacitated*, which is far more under Oberlin's policy than just "not sober."  *Id.* ¶¶ 192-94. Oberlin cannot simply disregard its definition of "incapacitation" at will.  Doing so is "arbitrary or capricious," as another federal trial court held in a remarkably similar case, *King v. DePauw Univ.*, No. 2:14-cv-70-WTL, 2014 WL 4197507, at *1 (S.D. Ind. 2014).  The plaintiff there was suspended by DePauw after a hearing panel concluded he should have known the complainant was incapacitated when they had sex. *Id.* at **11-12. He sought to preliminarily enjoin his suspension based on an implied (not express) contract claim, and to demonstrate a likelihood of success under Indiana law he had to show that his suspension was "illegal, arbitrary or capricious."  *Id.* at *11.  He did just that, the court concluded, because DePauw's policy, like Oberlin's, defined "incapacitation" as something more than intoxication, and there was no

---

[2] The Ohio cases on which Oberlin relies apply a heightened standard to breach of contract claims only when it is "the *academic* decisions of a college" that are being challenged, where educators have special expertise, *McDade v. Cleveland State University*, 2014-Ohio-4026, 2014 WL 4557015, at *4 (Ohio. Ct. App. 2014) (emphasis added), or when the action alleges no true breach of a specific contractual provision at all, but instead alleges breach of an apparently unwritten "contractual obligation" to provide a "fundamentally fair disciplinary hearing." *Ray v. Wilmington College*, 667 N.E.2d 39, 42 (Ohio Ct. App. 1995).  *Valente v. University of Dayton*, 438 Fed. Appx. 381 (6th Cir. 2011), an unpublished decision of the Sixth Circuit, relies solely on *Ray* in applying a heightened standard to claims alleging breach of specific contractual provisions in a challenge to non-academic discipline, *id.* at 384, and to that extent should not be followed.  *See Doe v. Case Western Reserve Univ.*, No. 1:17-cv-414, 2017 WL 3840418 at *10 (N.D. Oh. Sept. 1, 2017) (refusing school's request to apply heightened standard to breach of contract claim of student disciplined for sexual misconduct and denying motion to dismiss claim); *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at **10-11 (S.D. Ohio March 6, 2018) (applying no heightened standard in denying motion to dismiss contract claim of student disciplined for sexual misconduct).  No heightened standard properly applies.

evidence that the plaintiff witnessed signs of *incapacitation*, as opposed to mere intoxication. *Id.* at *12. That was true even though *others* had observed signs of severe intoxication in her before she met King, *id.* at *3, and even though it was "not unreasonable" to conclude that the complainant was in fact incapacitated, *id.* at *12. Because there was no affirmative evidence that the plaintiff himself witnessed signs of *incapacity* it was likely "arbitrary" to find him responsible for sexual assault. *Id.* The same is even more true here, because Roe positively testified that "I am not sober" was the only outward indication of her intoxication.

*Second*, in a tacit admission that the decision letter is untenable, **Oberlin twice relies on testimony the panel did not**: Roe's testimony at the hearing that Doe did not ask her to perform oral sex on him, but instead forced her to do so.[3] ***But the panel didn't find him guilty of doing that***, and for good reason: It is the polar opposite of what Roe said no fewer than three times before the hearing. Am. Compl. ¶ 126. If the panel had relied on that testimony, it would have been required, pursuant to the plain text of the Policy, to have said so in its decision letter. *Id.* ¶ 32. And Oberlin can no longer pretend otherwise, because it claims in its motion that the hearing panel in fact complied with its contractual obligation to "[e]xplain[] the [p]anel's [r]ationale in [w]riting." Dkt. No. 28-1 at 18. Whatever specious basis Oberlin may have had to justify the panel's decision with facts outside the decision letter is gone. Oberlin cannot justify the panel's decision with facts outside the letter after saying that the letter explains the panel's rationale. That it tries to do so shows that the panel's *actual* decision breached its contract with Doe.

Oberlin also offers no reason to justify dismissal of Mr. Doe's final breach of contract claim, the denial of his appeal based on the severity of his sanction. Oberlin pretends that Mr.

---

[3] *See* Docket No. 28-1 at 17 (arguing that Oberlin properly applied its definition of incapacitation because Roe said she wasn't sober *and* that she "physically resisted Plaintiff's efforts to force her to perform oral sex); *id.* at 18 (using the same reasoning to argue that the preponderance of the evidence supported its decision).

Doe asserts that "he was owed a more detailed written explanation than he received on appeal," and responds to this straw man by noting that the Policy does not "require[] Oberlin to provide detailed findings" on appeal. Dkt. No 28-1 at 19.  Mr. Doe's actual argument is not that Oberlin didn't say enough, but that what it said didn't make sense.  If students found responsible for sexual assault must be sanctioned within a range from suspension to expulsion, and if students have a right to appeal the severity of those sanctions, then the right to appeal "would be meaningless if a sanction within the permissible range could never be" too severe to be appealed. *Id.* ¶ 199.  Yet the only explanation Oberlin gave Doe for upholding his sanction was that it "fits within" the initial range of punishments for sexual assault, *id.* ¶ 200, which will be true for *every* sanction for sexual assault before an appeal is even filed.  If no sanction is "significantly disproportionate" so long as it is within the range of possible sanctions for an offense, then every permissible sanction for a given offense will necessarily be proportionate and appeals will be meaningless.  Oberlin's interpretation of these provisions "effectively nullifie[d]" Doe's "right to appeal the severity of his [] sanction," *id.* ¶ 201, and therefore violated the covenant of good faith and fair dealing.  Oberlin failed to engage with that argument in its first motion to dismiss and does so again here.  Its second reply brief is too late to do so.

## II.    THE COMPLAINT STATES A CLAIM FOR A TITLE IX VIOLATION.

Courts around the country, including the Sixth Circuit, have recognized the "erroneous outcome" theory of Title IX liability set out by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994).  *See Miami Univ.*, 882 F.3d at 592.  "To plead an erroneous-outcome claim, a plaintiff must allege: (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized . . . causal connection between the flawed outcome and gender bias."  *Miami Univ.*, 882 F.3d at 592 (citing *Doe v.*

9

*Cummins* 662 Fed. Appx. 437, 452 (6th Cir. 2016) and *Yusuf*, 35 F.3d at 715).  Courts are increasingly denying motions to dismiss such claims;[4] Oberlin's motion must be denied as well.

**A.      John Doe Has Cast Substantial Doubt on the Accuracy of the Outcome.**

Oberlin does not dispute that the Amended Complaint satisfies the first prong of analysis. As the Second Circuit explained in *Yusuf*, "the pleading burden" with respect to this first element of an erroneous outcome claim "is not heavy." 35 F.3d at 716.  It may be satisfied by "alleg[ing] particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A [student-plaintiff's] complaint may also allege particular procedural flaws affecting the proof." *Id.*  Doe alleges all of these.[5]  His Amended Complaint sails over this low bar.  *See, e.g.*, *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 187 (D.R.I. 2016).

**B.      John Doe Has Pled Facts That Amply Support an Inference of Gender Bias.**

**1.      Evidence of Gender Bias**

The Amended Complaint contains a host of evidence plausibly showing a particularized causal connection between Mr. Doe's expulsion and gender bias.  "Such allegations might

---

[4] *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018); *Doe v. Marymount Univ.*, ---F. Supp. 3d---, 2018 WL 1352158 at *10 (E.D. Va. March 14, 2018); *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043 at *16 (S.D. Oh. March 6, 2018); *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 WL 705886 at *9 (S.D. Oh. February 5, 2018); *Doe v. The Trustees of the University of Pennsylvania*, No. 2:16-cv-05088-JP, 2017 WL 4049033 (E.D. Pa. Sept. 13, 2017); *Doe v. Case Western Reserve Univ.*, 2017 WL 3840418 at **6-7 (N.D. Ohio Sept. 1, 2017); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1073 (S.D. Ohio 2017); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340-41 (S.D. Fla. 2017);  *Doe v. Amherst College*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017);  *Neal v. Colorado State Univ.-Pueblo*, 2017 WL 633045 at *14 (D. Colo. Feb. 16, 2017);  *Collick v. William Patterson Univ.*, 2016 WL 6824374 at **11-12 (D.N.J. Nov. 17, 2016); *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016).

[5] *See* Am. Compl. ¶¶ 7-10 (alleging there was no actual evidence showing he could have known of Roe's alleged incapacitation); *id.* ¶¶ 114-16, 189 (alleging facts suggesting "a motive to lie on the part of [the] complainant"); *id. passim* (alleging "procedural flaws affecting the proof" in the form of Oberlin's misapplication of various provisions in its Policy).

include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Miami Univ.*, 882 F.3d at 593 (citing *Yusuf*, 35 F.3d at 715).  "[E]xternal pressure . . . to discriminate against men," the court held, also supports a plausible inference of gender bias.  *Id.* at 594.  John Doe has a wealth of evidence of gender bias.

A. *John Doe alleges gender-biased "statements by [a] pertinent university official," Ms. Raimondo*.  Most notably, Ms. Raimondo expressly said, just eight months before Roe filed her complaint, that speaking of "grey areas" of sexual consent "is used too often to discredit particularly women's experiences of violence."  Am. Compl. ¶ 59.  That is direct evidence that gender bias plays a role in Oberlin's resolution of such "grey area" cases, because it is Ms. Raimondo who implemented the Policy from its inception through the time that Roe filed her complaint, and it is Ms. Raimondo who headed the Title IX Team that determined to send Ms. Roe's complaint through Oberlin's formal resolution process, which had a 100% conviction rate in the months immediately preceding the complaint.  It supports an inference that Oberlin, like Ms. Raimondo, avoids characterizing "grey area" cases as such, and that is precisely what John Doe's hearing panel did, concluding that Ms. Roe was *incapacitated* after finding *any* indication at all that Roe was intoxicated, no matter how slight.  That is not some aberration in Oberlin's process; that is the natural and foreseeable result of a survivor-centered process implemented by someone who believes that speaking of "grey areas" of consent discredits women's experiences of violence. Statements of that nature suffice by themselves to support an inference of gender bias.[6]

---

[6] *Doe v. Marymount Univ.*, 2018 WL 1352158, at *8 (single statement by adjudicator in subsequent proceeding that showed he held gendered views of men was enough to support inference of gender bias); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL

As explained above, Ms. Raimondo has also made statements that Title IX has "visibilize[d] [*sic*] harms experienced primarily by women and has shown that not all men are rapists. Am. Compl. ¶ 57.  This gendered view of the prototypical parties in Title IX proceedings also supports an inference of gender bias. *Schaumleffel v. Muskingum Univ.*, 2018 WL 1173043 at **16 (S.D. Ohio March 6, 2018) (denying motion to dismiss Title IX claim in part because of "the way Muskingum defines 'victim' as a woman").  So, too, does Ms. Raimondo's statement that she implemented the Policy "as a feminist committed to survivor-centered processes."  That is far different than simply "being a feminist or researching topics that affect women."  *Miami Univ.*, 882 F.3d at 601.  It is one thing to hold or research certain views, whether religious, political, or civic, and to put them aside when participating in an objective process.  It is another thing altogether to affirmatively bring them to bear on an enterprise.  What matters in a Title IX claim is not whether gendered actions are borne from an evil motive, but simply whether "a policy of bias favoring one sex over the other in a disciplinary dispute" has been adopted, "even temporarily," no matter the reason.  *Doe v. Columbia Univ.*, 831 F.3d at 58 n. 11.[7]  Especially in light of Ms. Raimondo's "grey areas" statement just one month later, it is plausible to infer gender bias from her statement that she approached this work as a feminist.

    B. _John Doe has statistical evidence of a pattern of gender-biased decision-making_.  The *Miami University* court found statistical evidence of gender bias where the plaintiff alleged that

---

4647996, at *10 (W.D. Va. Aug. 5, 2015) (investigator's statements about "grey rape" sufficed to establish gender bias in case where complainant alleged she was intoxicated).

[7] Oberlin additionally suggests there is no gender bias because Ms. Raimondo is not alleged to have "engaged in any conduct during Plaintiff's disciplinary process that demonstrates bias against males."  Docket No. 10-1 at 9.  But courts do not draw inferences only from statements made during a plaintiff's proceeding; gender bias is equally inferred from statements made before the initiation of any charges.  *See, e.g.*, *Doe v. Case Western Reserve Univ.*, 2017 WL 384018 at *6; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996 at *10 (W.D. Va. 2015).

18 out of 20 respondents from 2011-14 were male and that all males in academic year 2013-14 were found responsible).[8]  Mr. Doe alleges that 10 out of 10 respondents in a *seven-month period* (August 2015 – February 2016) were male and that all 10 were found responsible.  And like the plaintiff in *Miami University*, Mr. Doe points to evidence that the statistics are due to gender bias. He "points to his own situation," in which he was treated differently than a female complainant, as evidence "that [Oberlin] impermissibly makes decisions on the basis of a student's gender." *Miami Univ.*, 882 F.3d at 593-94; *see* Compl. ¶¶ 81-82 (contrasting Oberlin's response to his suffering as the process dragged on with its response to a female complainant).[9] He also explains how that formal resolution process is a survivor-centered process with gendered views of the prototypical parties and that Oberlin, via its Title IX Team (led by Ms. Raimondo in academic year 2015-16, *see* ¶ Compl. 24), decides who to send through its formal resolution process, *see* Compl. ¶¶ 26-27 (citing pages 34-35 of Sexual Misconduct Policy), a decision that, without exception in the relevant time period, resulted in a finding of responsible.

   C.  *Oberlin was experiencing significant external pressure when Roe filed her complaint*.
Oberlin had recently come under active OCR investigation and had for years been the focus of targeted pressure, from students and the media, regarding its sexual misconduct proceedings— two things routinely found to support an inference of gender bias. *Doe v. Cummins*, 662 Fed. App'x at 453 (active OCR investigation supports inference of gender bias); *Doe v. The Trustees of the University of Pennsylvania*, No. 2:16-cv-05088-JP, 2017 WL 4049033 at *16 (E.D. Pa. Sept. 13, 2017) (two newspaper articles highlighting school's handling of assault allegations

---

[8] As Mr. Doe has explained, his statistical evidence in fact exceeds what the plaintiff in *Doe v. Miami* alleged.  *See* Dkt. No. 12 at 16 n. 12 (comparing the statistics in *Miami* with Oberlin's).

[9] Unlike the plaintiff in *Doe v. Miami*, Mr. Doe does not allege that the female complainant should have been investigated herself.  *See Doe. v. Miami*, 2018 WL 797451 at *9 (alleging that Miami "initiated an investigation into him but not Jane").  Also unlike the plaintiff there, Mr. Doe has no affidavit from a local attorney attesting anecdotally to Oberlin's practices.  *Id.*

13

supported inference of gender bias).[10]  Mr. Doe also pleads general pressure upon Oberlin before

(and during) initiation of the OCR complaint, pressure he demonstrates was gender-biased.  Am.

Compl. ¶¶ 49-50.[11]  Here, too, Mr. Doe's evidence exceeds that of the plaintiff in *Miami*

*University,* who pled only general external pressure from OCR (not the targeted pressure of an

OCR investigation) and a single lawsuit against the school.  *Miami Univ.*, 882 F.3d at 594.

      D.  *Mr. Doe alleges a host of evidence that, in conjunction with the above evidence,*

*further supports an inference of gender bias*.  In light of the above evidence of gender bias,

additional evidence that, on its own, might show only victim bias adds further plausibility to an

inference of gender bias.  Numerous courts have so held.  *See, e.g.*, *Doe v. Marymount Univ.*,

No. 1:17-CV-401, 2018 WL 1352158, at **9-10 (E.D. Va. Mar. 14, 2018) (holding that single

gendered-biased statement of adjudicator sufficed to establish gender bias, and that "failure to

consider evidence that supported Doe's claims," the length of the proceeding, and the crediting

of the complainant's "implausible allegations" added further plausibility to the inference); *Doe v.*

*Lynn Univ., Inc.*, 235 F. Supp. 3d at 1341-42 (holding that, while national pressure from OCR

"without more" does not support an inference of bias, it "may add plausibility to an otherwise-

_____

[10] *See also Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1073 (S.D. Ohio 2017) (pressure and
publicity from lawsuit filed two months before investigation supported inference of gender
bias)*Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340-41 (S.D. Fla. 2017) (media attention
from school security's decision not to charge different student with misconduct in February 2015
supported inference of gender bias against plaintiff seven months later); *Doe v. Amherst College*,
238 F. Supp. 3d 195, 223 (D. Mass. 2017) (allegation that school punished plaintiff to appease
student movement pushing "to change the way it handled sexual assault allegations" sufficient to
establish inference of gender bias); *Doe v. Columbia Univ.*, 831 F.3d at 58 (local pressure
supported inference of gender bias); *Wells v. Xavier*, 7 F. Supp. 3d at 747, 751 (initiation of OCR
investigation six months before plaintiff was charged supported inference of gender bias).

[11] The College tries to argue that "political and public pressure to wrongly find accused male
students responsible for sexual misconduct has been repeatedly rejected by the courts" as
evidence of gender bias.  Docket No. 28-1 at 13-14.  It is difficult to see how Oberlin can still
argue that after the Sixth Circuit's decision in *Miami University*, which held that "external
pressure from the federal government" supported an inference of gender bias.  882 F.3d at 594.

conclusory allegation of bias").[12]  Here, that allows this Court to infer that the campus

newspaper's repeated insistence that the female accuser in the *Rolling Stone* saga be believed,

Compl. ¶¶ 46-47; that the Counseling Center's insistence that assault happens when someone

*feels* assaulted, no matter the facts, *id.* ¶ 45; that the faculty guides instructing administrators

simply to believe reports of assault, *id.* ¶¶ 41-44; that Doe's own advisor also adhered to that

philosophy, *id.* ¶¶ 57-62; the length of Doe's proceeding, *id.* ¶¶ 81, 83, 122; and that Doe's

unsupportable expulsion evince not just victim bias but gender bias.

### 2. The College's Efforts to Explain Away Its Gender Bias Fail.

Oberlin offers no cogent reasons why the above evidence does not support a plausible

inference of gender bias.

First, Oberlin responds to Ms. Raimondo's "grey area" comment by arguing that just

because Mr. Doe does not "self-identify" as a predator does not mean he isn't one.  A proper

attack on that ground would have been to identify allegations tending to show Mr. Doe was a

predator, but there are none.  The allegations show just the opposite: Ms. Roe *asked* to come to

---

[12] *See also Neal v. Colorado State Univ.-Pueblo*, No. 1:16-cv-873, 2017 WL 633045 at *14 (D. Colo. Feb. 16, 2017) (refraining from deciding whether OCR pressure or procedural deficiencies alone could support inference of gender bias because "all of Plaintiff's allegations together," including "pressure to avoid DOE investigation and . . . procedural shortcomings" sufficed to support plausible inference of gender bias); *Doe v. Brown Univ.*, 166 F. Supp. 3d at 189 (finding that "numerous and significant procedural flaws in Plaintiff's disciplinary hearing" supported plausible inference of gender bias when viewed in conjunction with statements from former employee and professor that Title IX process at Brown was generally gender-biased); *Collick v. William Patterson Univ.*, 2016 WL 6824374 at **11-12 (Nov. 17, 2016) (allegations that female complainant's claims "were accepted as true without any investigation," that the plaintiffs were "not afforded a thorough and impartial investigation," and that OCR exerted national pressure on universities together supported plausible inference of gender bias); *Ritter v. Oklahoma City Univ.*, 2016 WL 3982554, at *2 (W.D. Okla. July 22, 2016) (holding that, even though "allegations of discriminatory intent [we]re sparse," because those allegations, in conjunction with "the asserted facts underlying plaintiff's alleged offense, the alleged manner in which the investigation and disciplinary process were conducted," and allegations that a female would have been treated differently supported a plausible inference of gender bias).

*his* place, Am. Compl. ¶ 72, they engaged in 45 minutes of talking and consensual sexual activity, *id.* ¶ 184, they stopped as soon as Ms. Roe indicated discomfort, *id.* ¶ 78, Mr. Doe asked Ms. Roe to perform oral sex on him, *id.*, and she exhibited no signs of incapacitation, *id.* ¶ 145. There is ample support in the Amended Complaint for inferring that Mr. Doe was no predator. His case quite obviously falls in that "grey area" where lack of consent is not unambiguous.

Second, Oberlin responds to Ms. Raimondo's comments about the "first goal" she identified for a Title IX hearing, Am Compl. ¶ 57, by noting that she also said those proceedings should help respondents "be responsible for the harm you've done to others, if in fact that was the result of your conduct?"  Dkt. No. 28-1 at 11.  Putting aside that the second goal makes her comments look more biased, not less, it doesn't change what she identified as the first goal of such hearings.  It is plausible to infer that the truth-finding function is subordinate to these first-listed goals and that the primary goal overall is the protection of complainants. Oberlin wants to infer from her comments that all of those goals are equally important to her, and that may indeed be plausible, but it's also plausible that the first goal really is first in her mind, and at the motion to dismiss stage any plausible inference must be drawn in Mr. Doe's favor.

Third, Oberlin tries to defuse the fact of its 100% conviction rate by arguing that it is not responsible for the gender makeup of its respondents.  Dkt. No. 28-1 at 12.  But that same logic would undercut the Sixth Circuit's reliance on statistics in *Miami University*.  It isn't viable. More to the point, Oberlin continues to ignore that Mr. Doe *does* allege that Oberlin is responsible for the gender makeup of its respondents, because its Title IX Team (led by Ms. Raimondo) decided which students were sent through its formal resolution process, Compl. ¶ 27, and it is that process that, in 2015-16, inevitably meant a finding of responsibility.

In all of its arguments, what Oberlin really asks the court to do is to find its proposed alternative inferences more plausible than Mr. Doe's and to dismiss his Title IX claim on that basis.  But even if Oberlin's desired inferences were the more plausible ones, "[t]his reasoning fails to recognize the court's obligation to draw reasonable inferences *in favor of* the sufficiency of the complaint. *Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct.  It is sufficient if the inference of discriminatory intent is plausible." *Doe v. Columbia Univ.*, 831 F.3d at 57. It is a heightened pleading standard, reserved for special contexts, that requires a plaintiff to show that his inferences are as plausible as competing inferences. *Frank v. Dana Corp.*, 646 F.3d 954, 957 (6th Cir. 2011) ("strong inference" of scienter required for securities fraud plaintiffs requires that inference be "*at least as* plausible as any non-culpable inference") (emphasis in original).

Mr. Doe has amply pled facts supporting a particularized causal connection between gender bias and his erroneous expulsion.  Ms. Raimondo, who took a gendered approach to Title IX enforcement, especially in grey area cases like Mr. Doe's, implemented the Policy from its inception and led the team that chose to send Mr. Doe to a formal hearing, a process that inevitably resulted in findings of responsibility that year.  Even if there weren't such a direct line from Ms. Raimondo's gender bias to Mr. Doe's expulsion, there still is the type of school-wide evidence—statistical patterns and external pressure—that supports "a particularized causal connection" under *Miami University*.  Oberlin's motion must be denied as to Count II.

## III.   THE COMPLAINT STATES A CLAIM FOR NEGLIGENCE.

Count III alleges that Oberlin breached a "duty to Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions."  Am. Compl. ¶ 220.  To prove negligence in Ohio, as in

other states, "one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St. 3d 75, 77 (1984). "Whether a duty exists depends largely on the foreseeability of the injury to one in the plaintiff's position." *Jeffers*, 43 Ohio St. 3d at 142.  The test for foreseeability "is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee*, 15 Ohio St. 3d at 77.

Given these guidelines, Oberlin owed Mr. Doe and all of its students a duty to exercise reasonable care when disciplining them.  It is readily foreseeable that universities will have to discipline their students—that is why codes of conduct exist—and it is just as foreseeable that a wrongful expulsion, particularly for something as "stigmatizing" as sexual assault, *see Starishevsky v. Hofstra Univ.*, 612 N.Y.S.2d 794, 796 (Sup. Ct. 1994), carries serious injury and "important and irreversible consequences" for the accused.  *See* Am. Compl. ¶ 220.  Courts that have confronted the question have found such a duty.  *See, e.g.*, *Doe v. Univ. of the South*, 2011 WL 1258104 at *21 (university owed common law duty to student disciplined for sexual misconduct).[13]  Another court in this District likewise denied a motion to dismiss that portion of a negligence claim based on duties alleged to arise from OCR guidance.  *Doe v. Case Western Reserve. Univ.*, 2017 WL 3840418 at *12 (denying motion to dismiss portion of negligence claim not based on duties expressly alleged to arise from contract).  Educational institutions do not get special immunity from Ohio's negligence laws.

---

[13] *Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016) (denying motion to dismiss negligence claim of student disciplined for sexual misconduct); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (school "had a duty to administer the Honor Code proceedings in a fair and impartial" and reasonable jury "could conclude . . . that the College was negligent in its handling of the proceedings"); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 1981) ("[W]e hold that common law imposes a duty on the part of private universities not to expel students in an arbitrary manner.").

18

Oberlin seeks to avoid that fact by asserting that "the 'duties [Plaintiff] identifies all arise from his contractual relationship with [Oberlin.]"  Docket No. 10-1 at 19.  But that bald assertion simply isn't true.  Mr. Doe alleges a number of acts on Oberlin's part that violate no express contractual provision but which nevertheless denied him a fair hearing.[14]  Ohio courts have repeatedly recognized that "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based" will lie "if the breaching party also breaches a duty owed separately from that created by the contract."  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 151 (1996) (citing *Battista v. Lebanon Trotting Assn.* 538 F.2d 111 (6th Cir. 1976)).  Oberlin cannot somehow extinguish its common law duties by contractually promising its students a certain set of procedures.  No promise can give Oberlin license to impose discipline arbitrarily or otherwise flout its common law obligations.  A school that promised its students a full-blown criminal trial before unfailingly finding them guilty has simply constructed the world's most elaborate kangaroo court. Oberlin has a duty to discipline students fairly no matter what procedures it promises them.

Oberlin argues as a back-up that Mr. Doe's negligence claim "'is essentially one for educational malpractice which is not recognized in Ohio.'"  Dkt. No. 28-1 at 20 (quoting *Doe v. Univ. of Dayton*, No. 17-cv-134, 2018 WL 1393894, at *12 (S.D. Oh. Mar. 20, 2018)).  But that just isn't true, as Oberlin itself surely must know. "Educational malpractice" is "[a] claim that educational services provided were inadequate."  *Lawrence v. Lorain Cty. Cmty. Coll.*, 127 Ohio App. 3d 546, 549, 713 N.E.2d 478, 480 (1998); *Trutschel v. Kettering Med. Ctr.*, 2009-Ohio-3302, ¶¶ 33-34, 2009 WL 1914549 at *6 (Ohio Ct. App. 2009) (same).  It has nothing to do with

---

[14] *See, e.g., id.* ¶¶ 39-47, 52-62, 209, 221 (detailing establishment of disciplinary system, and instillment of ethos, demanding that every student alleging sexual assault be believed with little to no regard for the truth or falsity of their assertions); *id.* ¶ 222 (alleging negligent training of administrators); *id.* ¶¶ 60-65, 123-24, 215 (detailing selection of Mr. Bautista as Doe's advisor).

negligence claims based on discipline for behavioral misconduct, as another court in this District recently explained in great detail:

> It is clear that all of the cases dismissing plaintiffs' negligence claims as educational malpractice claims involved claims that the education received by the plaintiffs was in some way lacking. Here Plaintiff's Complaint focuses on CWRU's investigation and disciplinary proceedings and the School's policies regarding the same and not on the education he received. As such, Plaintiff's negligence claim is not a claim for educational malpractice.

*Case Western Reserve Univ.*, 2017 WL 3840418 at *12. Other states hold the same.[15]

Because Oberlin owed Doe a duty of care when disciplining him, the only remaining question is whether Oberlin's failure to exercise reasonable care when doing so proximately caused his expulsion. Proximate cause exists when "the injury sustained [is] the natural and probable consequence of the negligence alleged." *Jeffers*, 43 Ohio St. 3d at 143 (quotation marks omitted). Oberlin asserts, but presents no argument, that proximate cause is not adequately pled (Dkt. No. 28-1 at 20 n. 15); it may not do so for the first time in reply. The Amended Complaint, in any event, alleges facts showing why Doe's conviction wasn't just the "natural and probable" consequence of that system and ethos; from 2015 to 2016, it was their inevitable consequence. Am. Compl. ¶¶ 39-47, 52-62, 123-24, 209, 215, 221-23.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that the College's Motion to Dismiss be denied.

---

[15] *See, e.g.*, *Papelino*, 633 F.3d at 93, 95 (noting that "New York law does not recognize a claim for 'educational malpractice'" yet concluding that school "had a duty to plaintiffs to administer the Honor Code proceedings in a fair and impartial manner" and that a reasonable jury could conclude it "was negligent in its handling of the proceedings").

DATED:  April 6, 2018              Respectfully submitted,

/s/ Christopher C. Muha
Justin Dillon (D.C. Bar No. 502322)
Christopher C. Muha (Ohio Bar No. 0083080)
KAISERDILLON PLLC
1401 K Street NW, Suite 600
Washington, DC 20005
(202) 640-2850
(202) 280-1034 (facsimile)
jdillon@kaiserdillon.com
cmuha@kaiserdillon.com

*Attorneys for Plaintiff John Doe*